IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CENTER FOR FOOD SAFETY; KAHEA; FRIENDS OF THE EARTH, INC., and PESTICIDE ACTION NETWORK NORTH AMERICA, | ) ) ) ) | CIV. NO. 03-00621 JMS/BMK |
| Plaintiffs, | ) ) ) | AMENDED ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR |
| vs. | ) ) ) | SUMMARY JUDGMENT AND GRANTING IN PART AND |
| MIKE JOHANNS, Secretary, U.S. Department of Agriculture; WILLIAM T. HAWKS, Under Secretary of Agriculture for Marketing and Regulatory Programs; BOBBY R. ACORD, Deputy Administrator, U.S. Department of Agriculture, Animal and Plant Health Inspection Service and CINDY SMITH, Deputy Administrator, U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Biotechnology Regulatory Services Program, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. _____ | ) ) | |

AMENDED ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN
PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT[1]

---

[1] This Amended Order supersedes and replaces the court's August 10, 2006 Order.

I. <u>INTRODUCTION</u>

From 2001 to 2003, four companies -- ProdiGene, Monsanto, Hawaii Agriculture Research Center (HARC), and Garst Seed -- planted corn and sugarcane that had been genetically modified to produce experimental pharmaceutical products.  The companies modified the genetic structure of the corn or sugarcane so that, when harvested, the plants would contain hormones, vaccines, or proteins that could be used to treat human illnesses.  For example, one company engineered corn to produce experimental vaccines for the Human Immunodeficiency Virus and the Hepatitis B virus, while another company engineered corn and sugarcane to produce cancer-fighting agents.  These techniques are still experimental, and from 2001 to 2003 these four companies conducted limited field tests of these genetically engineered pharmaceutical-producing plant varieties ("GEPPVs") on Kauai, Maui, Molokai, and Oahu.

ProdiGene, Monsanto, HARC, and Garst Seed received permits to plant these crops from the United States Department of Agriculture, Animal and Plant Health Inspection Service ("APHIS").  The companies have already planted and harvested these crops, the permits have expired, and the companies are no longer planting crops pursuant to these permits.

2

The Plaintiffs argue that APHIS[2] broke the law in issuing these permits.  Because these crops produce experimental pharmaceutical products, the Plaintiffs argue, their effect on Hawaii's ecosystem (especially Hawaii's 329 endangered and threatened species) is unclear.  The Plaintiffs contend that these experimental crops could cross-pollinate with existing food crops, thus contaminating the food supply.  The Plaintiffs also argue that animals that feed on corn (as well as animals further up the food chain that feed on corn-eating animals) would become unwitting carriers of experimental pharmaceutical products, causing even more widespread dissemination of these experimental vaccines, hormones, and proteins.  According to the Plaintiffs, APHIS was required to evaluate the environmental impact of these genetically engineered crops before issuing the permits.  In failing to do so, the Plaintiffs argue, APHIS violated both the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA").  The Plaintiffs also argue that these four permits were part of a broader "GEPPV program":  a collection of policies and protocols which, taken together, form a comprehensive program for the promotion and regulation of GEPPV development and testing.  The Plaintiffs contend that APHIS

---

[2] For ease of reference, the court will refer to the Defendants collectively as "APHIS" or "Defendants."

was required to consider the environmental impact of the program as a whole and that APHIS's failure to do so constitutes an additional violation of NEPA and the ESA.  As a remedy for failing to follow NEPA and the ESA in implementing this "GEPPV program," the Plaintiffs seek a nationwide ban on all GEPPV open-air field testing until APHIS complies with NEPA and the ESA.

APHIS, on the other hand, argues that it fulfilled its statutory obligations.  APHIS contends that it placed strict conditions on the permits to ensure that the genetically modified crops would not contaminate the environment, such that it complied with both the ESA and NEPA.  According to APHIS, because the Plaintiffs have failed to demonstrate any environmental harm from these open-air field tests, the Plaintiffs' claims necessarily fail.  And as for the alleged "GEPPV program," APHIS argues that its internal policies and protocols do not rise to the level of "final agency action"; consequently, APHIS contends, the Plaintiffs are not entitled to judicial review of this "program."

In addition to the dispute over the four permits and the alleged "GEPPV program," there is a dispute over a petition for rulemaking submitted to APHIS by the Plaintiffs.  The Plaintiffs submitted their Petition to APHIS on December 16, 2002; the Petition sought five specific actions from APHIS, and the

Plaintiffs argue that APHIS arbitrarily and capriciously denied the Petition.

APHIS contends that the Plaintiffs' claims are not ripe and must be dismissed.

After more than two and a half years of contentious litigation, the

court heard the parties' motions for summary judgment on July 7, 2006.[3]  Based on

the following, the court GRANTS IN PART and DENIES IN PART the Plaintiffs'

motion for summary judgment and GRANTS IN PART and DENIES IN PART the

Defendants' motion for summary judgment.[4]  The court concludes that APHIS

violated both the ESA and NEPA in issuing the four permits, but concludes that

injunctive relief is not necessary to remedy these violations.  The court then

concludes that APHIS's alleged "GEPPV program" was neither a "final agency

action" subject to review under the Administrative Procedure Act nor "agency

action" subject to the requirements of the ESA.  Finally, the court concludes that

the Defendants are entitled to summary judgment as to the Plaintiffs' claim

regarding their rulemaking Petition.

---

[3] On August 22, 2006, the court heard additional arguments regarding Counts Five and Ten of the Plaintiffs' Second Amended Complaint.

[4] As discussed more fully *infra*, the court grants summary judgment in favor of the Plaintiffs as to Counts One, Two, Three, Four, Six, Seven, Eight, and Nine of the Plaintiffs' Second Amended Complaint, and the court grants summary judgment in favor of the Defendants as to Counts Five, Ten, and Eleven of the Second Amended Complaint.

5

## II. BACKGROUND

### A.   Legal Framework

A brief description of the legal framework applicable to the instant case may assist in placing the facts in context.  The Plaintiffs allege APHIS violated the ESA, NEPA, and the Plant Protection Act ("PPA"); the court first discusses the Administrative Procedure Act ("APA"), which provides for judicial review of agency action, and then examines the ESA, NEPA, and the PPA.

### 1.      Administrative Procedure Act

The APA allows for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]"  5 U.S.C. § 704.  *See also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) ("[T]he APA, 5 U.S.C. § 702, provides for judicial review of agency actions if two requirements are met.  First, the claimants must identify an 'agency action.' . . . Second, the plaintiffs must establish they have suffered a legal wrong, or will be adversely affected or aggrieved within the meaning of a relevant statute." (Citations omitted.)).  The APA defines "agency action" as "includ[ing] the whole

6

or a part of an agency rule, order, license, sanction, relief, or the equivalent or

denial thereof, or failure to act[.]"  5 U.S.C. § 551(13).  As discussed more fully

*infra*, some statutes (such as the ESA) contain provisions allowing for greater

judicial review than that provided in the APA, whereas many statutes (such as

NEPA) do not contain their own review standards (such that the APA standards

control).

As set forth in 5 U.S.C. § 706, the "arbitrary and capricious" standard

of review applies to judicial review of agency actions:

> The reviewing court shall–
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be–
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > (B) contrary to constitutional right, power, privilege, or  immunity;
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
> > (D) without observance of procedure required by law . . . .

//

//

### 2.     Endangered Species Act

One of the express policies of the Endangered Species Act, 16 U.S.C. § 1531 et seq., is to ensure "that all Federal departments and agencies shall seek to conserve endangered species and threatened species[.]" 16 U.S.C. § 1531(c)(1). The ESA mandates interagency collaboration, through a series of procedural requirements outlined in the statute, to effectuate Congress's goals of protecting endangered and threatened plant and animal species.  16 U.S.C. §§ 1532, 1536. Specifically, the ESA requires the following:

> [E]ach Federal agency shall . . . request of the Secretary [of the Interior] information whether any species which is listed or proposed to be listed [as an endangered species or a threatened species] may be present in the area of such proposed action.  If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action.

16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c) (requiring federal agencies to request information regarding listed species and critical habitat from the Department of the Interior).  *See also* 16 U.S.C. § 1532(15) (defining "Secretary"); 16 U.S.C. § 1533 (setting forth guidelines for listing endangered and threatened species).  In other words, whenever an agency is considering taking an "action," that agency must request a list, from either the United States Fish and Wildlife

Service ("FWS") or the National Marine Fisheries Service ("NMFS"), of those

endangered and threatened species present in the geographic area of the proposed

action.  As the Ninth Circuit recently explained:

> An agency's decision whether to take a discretionary action
> that may jeopardize endangered or threatened species is strictly
> governed by ESA-mandated inter-agency consultation
> procedures.  First, the agency contemplating the action must
> request information from the appropriate federal wildlife
> service regarding "whether any species which is listed or
> proposed to be listed may be present in the area of such
> proposed action."

*Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006) (quoting 16

U.S.C. § 1536(c)(1)) (citations omitted).

The ESA and the regulations implementing the ESA, 50 C.F.R. Part

402, describe various processes ("informal consultation," "formal consultation,"

and "biological assessment") and the circumstances under which an agency must

engage in each type of process.  *See Forest Guardians*, 450 F.3d at 457 ("If [FWS]

determines that listed species may be present in the affected area, the agency

preparing to act must produce a 'biological assessment' in accordance with the

[NEPA] . . . .  If the biological assessment concludes that listed species are in fact

likely to be adversely affected, the agency ordinarily must enter 'formal

consultation' with [FWS].").

As discussed *supra*, the APA allows for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court[.]"  5 U.S.C. § 704.  The ESA falls into the former category, as it contains a broad citizen suit provision allowing suits "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . , who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof to enforce the ESA. 16 U.S.C. § 1540(g)(1)(A).

The Plaintiffs allege that APHIS failed to follow the procedures outlined in 16 U.S.C. § 1536.  These procedural requirements, however, only apply to "agency action," a term defined by the ESA as "any action authorized, funded, or carried out by" a federal agency.  16 U.S.C. § 1536(a)(2).  The joint regulations (promulgated by the United States Fish & Wildlife Service and the National Marine Fisheries Service) implementing the ESA similarly provide:

> "Action" means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:  (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

10

50 C.F.R. § 402.02.  APHIS does not dispute that issuance of the four permits is "agency action" sufficient to trigger the requirements of the ESA.  The parties disagree, however, as to whether APHIS's purported "GEPPV program" is an "agency action" within the meaning of the ESA.  As discussed *infra*, the court concludes that this "GEPPV program" is not an "agency action" under the ESA.

### 3.  National Environmental Policy Act

The National Environmental Policy Act, 42 U.S.C. § 4321 et seq., states that "each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."  42 U.S.C. § 4331(c).  To that end, NEPA requires federal agencies to evaluate the impact of their actions on the natural environment.  *See* 42 U.S.C. § 4332.  Specifically, NEPA requires all federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on . . . the environmental impact of the proposed action[.]"  42 U.S.C. § 4332(2)(c).

Through NEPA, Congress established the Council on Environmental Quality ("CEQ"), which has promulgated regulations requiring all agencies to comply with certain procedures before acting.  42 U.S.C. § 4342; 40 C.F.R. Part

1500.  The CEQ regulations require agencies to prepare an "environmental assessment" ("EA") and/or an "environmental impact statement" ("EIS") before acting, except in limited circumstances.  40 C.F.R. §§ 1501.3, 1501.4.  An EIS is "a detailed written statement as required by" NEPA, and an EA is "a concise public document" that an agency prepares when deciding whether it needs to prepare a more extensive EIS.  40 C.F.R. §§ 1508.9, 1508.11.

There are circumstances under which an agency may avoid preparing either an EA or an EIS.  The CEQ regulations allow federal agencies to develop "categorical exclusion[s]" to the EA/EIS requirements for routine agency actions that are known to have no significant effect on the human environment:

> *Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. . . .  Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.

APHIS promulgated its own regulations to ensure that its actions complied with NEPA and with the CEQ regulations.  In 7 C.F.R. § 372.5, APHIS describes four categories of actions:  "Actions normally requiring environmental

12

impact statements"; "Actions normally requiring environmental assessments but not necessarily environmental impact statements"; "Categorically excluded actions"; and "Exceptions for categorically excluded actions." (Italics omitted.) In other words, 7 C.F.R. § 372.5 generally tracks the CEQ's requirements (as set forth in 40 C.F.R. § 1508.4): it allows federal agencies to develop categorical exclusions, but requires agencies to "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect."

The APHIS regulations regarding categorically excluded actions provide in relevant part:

> This class of APHIS actions shares many of the same characteristics . . . as the class of actions that normally requires environmental assessments but not necessarily environmental impact statements. The major difference is that the means through which adverse environmental impacts may be avoided or minimized have actually been built right into the actions themselves. The efficacy of this approach generally has been established through testing and/or monitoring. . . . [Types of categorically excluded actions] include:
> . . . .
> (3) *Licensing and permitting.* . . .
> (ii) Permitting, or acknowledgement of notifications for, confined field releases of genetically engineered organisms and products[.]

7 C.F.R. § 372.5(c). The relevant exception to this categorical exclusion appears in 7 C.F.R. § 372.5(d):

13

Whenever the decisionmaker determines that a categorically excluded action may have the potential to affect "significantly" the quality of the "human environment," as those terms are defined at 40 CFR 1508.27 and 1508.14, respectively, an environmental assessment or an environmental impact statement will be prepared. For example:

. . . .

(4) When a confined field release of genetically engineered organisms or products involves new species or organisms or novel modifications that raise new issues.

In sum, APHIS does not need to prepare an EA or an EIS when it issues permits for actions in which "the means through which adverse environmental impacts may be avoided or minimized have actually been built right into the actions themselves" -- such as "confined field release[s] of genetically engineered organisms and products" -- so long as those field releases do not "involve[] new species or organisms or novel modifications that raise new issues."[5]

In interpreting the statutes and regulations cited *supra*, the Ninth Circuit has held that, "[w]hen an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). "NEPA's procedural requirements require agencies to take a 'hard look' at the environmental consequences of their actions.  A hard look includes 'considering

---

[5] Although there are other exceptions to the categorical exclusions, the court is focusing only on the sole exception that is relevant to the instant case.

14

all foreseeable direct and indirect impacts.'" *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006) (quoting *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002)).  "'An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment.'"  *Alaska Ctr. for the Env't*, 189 F.3d at 859 (quoting *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986)).  To comply with NEPA, "'[t]he agency must supply a convincing statement of reasons why potential effects are insignificant.'" *Id.* (quoting *Steamboaters v. Fed. Energy Regulatory Comm'n*, 759 F.2d 1382, 1393 (9th Cir. 1985)).

There does not appear to be any specific process an agency must follow in determining that a categorical exclusion applies and that an exception to that exclusion does not apply; the agency must simply explain its decision in a reasoned manner.  *Cal. v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("In many instances, a brief statement that a categorical exclusion is being invoked will suffice."); *Alaska Ctr. for the Env't*, 189 F.3d at 859 ("Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference.").

Once again, however, a court may only review an agency's activity if that activity rises to the level of "final agency action." Unlike the ESA, NEPA does not contain its own definition of "agency action." Instead, NEPA uses the definition from the APA, which provides that "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). *See ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998) ("NEPA [does not] contain provisions allowing a right of action. A party alleging violations of NEPA . . . can bring an action under the APA challenging an 'agency action.'"). As with the Plaintiffs' ESA claims, APHIS does not dispute that issuance of the four permits is "agency action" sufficient to trigger the requirements of NEPA, but APHIS argues that the alleged "GEPPV program" is not "agency action" within the meaning of NEPA and the APA. As discussed *infra*, the court concludes that this "GEPPV program" is not a "final agency action" under NEPA.

### 4. Plant Protection Act

The Plant Protection Act ("PPA"), 7 U.S.C. § 7701 et seq., was enacted in 2000 to attempt to detect, control, eradicate, and suppress plant pests and noxious weeds. 7 U.S.C. § 7701(1). The PPA gives the Secretary of Agriculture the authority to promulgate regulations to prevent the introduction and

16

dissemination of plant pests.  7 U.S.C. §§ 7702(16), 7711(a).  The PPA regulations

appear in 7 C.F.R. Part 340.

       The Plaintiffs do not claim that APHIS violated the PPA.  Instead, as

discussed more fully *infra*, the Plaintiffs contend that they asked APHIS to

promulgate rules pursuant to the PPA; that APHIS ignored the Plaintiffs' request

for the past three and a half years; and that APHIS's inaction violated the APA.

As explained below, the court concludes that some of the Plaintiffs' claims are

unripe inasmuch as they do not address "final agency action"; the court concludes

that the remaining claims are ripe but that APHIS's actions were neither arbitrary

nor capricious.

B.    <u>Factual Background</u>

       Between 2001 and 2003, ProdiGene, Monsanto, HARC, and Garst

Seed submitted applications to APHIS to conduct field tests of GEPPVs in various

locations in Hawaii.  The administrative record indicates that APHIS reviewed

each of the four permits pursuant to the PPA regulations contained in 7 C.F.R. Part

340 (regulating the introduction of genetically modified organisms which are or

may be plant pests).  For each permit application, APHIS sent a letter (at least two

pages long in all four cases) to the State of Hawaii.  These letters indicated that

APHIS believed that the proposed field testing would not present any risk of plant

pest introduction or dissemination; the letters also asked the State to comment on

APHIS's findings and respond to APHIS within thirty days.  Administrative

Record ("AR") 50-52 (review of Prodigene's application); AR 151-53 (HARC);

AR 297-99 (Garst Seed); AR 595-97 (Monsanto).

In its letters to the State, APHIS explained that some of the donor

organisms used by the four companies in their field tests were "plant pests" as

described in 7 C.F.R. Part 340.  Nevertheless, APHIS approved the four permits,

making specific findings as to each permit that the proposed field testing was

"confined" or "controlled" and therefore in compliance with 7 C.F.R. § 340.4

("Permits for the introduction of a regulated article.").[6]  AR 50 ("[W]e conclude

that this is a confined release of the genetically engineered corn plants described

in this application, and the test will not present any risk of plant pest introduction

or dissemination for the reasons cited below[.]"); AR 151 ("[W]e conclude that

this is a confined release of the genetically engineered sugarcane plants described

in this application, and that the test will not present any risk of plant pest

introduction or dissemination for the reasons cited below[.]"); AR 298 ("[W]e

---

[6] The PPA regulations do not specifically use the words "confined" or "controlled," but the regulations require an applicant to include, *inter alia*, "[a] detailed description of the processes, procedures, and safeguards which have been used or will be used in the country of origin and in the United States to prevent contamination, release, and dissemination[.]" 7 C.F.R. § 340.4(b)(10).  The word "confined" is used in 7 C.F.R. § 372.5(c)(3)(ii) (the categorical exclusion in APHIS's NEPA regulations), but not in the PPA regulations.

conclude that controlled field testing of the genetically engineered corn plants

described in this application will not present any risk of plant pest introduction or

dissemination for the reasons cited below[.]"); AR 596 ("[W]e conclude that

controlled field testing of the genetically engineered corn plants described in this

application will not present any risk of plant pest introduction or dissemination for

the reasons cited below[.]").  These findings were specifically limited to the PPA.

Nothing in the administrative record demonstrates that APHIS made any findings

or conclusions specifically regarding categorical exclusions or exceptions to those

exclusions for purposes of complying with NEPA.[7]

Similarly, nothing in the administrative record indicates that APHIS

considered whether approval of the four permits would adversely affect

endangered or threatened species or critical habitats.  In fact, the only indication in

the administrative record that anyone considered endangered species in relation to

---

[7] The PPA is more narrowly focused than NEPA:  whereas the PPA targets "plant pests" and "noxious weeds," 7 U.S.C. § 7701(1), NEPA's goal is "preservation and enhancement of the environment."  42 U.S.C. § 4331(c).  The limited finding that APHIS took the "hard look" required by the PPA (regarding the environmental consequences to *plants*), even under a highly deferential standard of review, does not satisfy the requirement that APHIS consider NEPA's broader environmental considerations.  Thus, as discussed more fully *infra*, absent *anything* in the administrative record demonstrating that APHIS considered broader environmental concerns beyond the narrow issue of the spread of plant pests and noxious weeds, APHIS's action was arbitrary and capricious.

these four permits is a list of species provided by ProdiGene in an amendment to

their permit application.  AR 77.

On December 16, 2002, the Plaintiffs submitted a Petition on

Genetically Engineered Pharmaceutical-Producing Plant Varieties ("Petition") to

APHIS.  Plaintiffs' Concise Statement of Material Facts in Support of Motion for

Summary Judgment ("Plaintiffs' Concise"), Ex. 18.  The Petition asked APHIS to

do the following:

> 1.  Promulgate New GEPPV Regulations.  Publish draft and
> then final regulations that promulgate mandatory state-of-the-
> art protections, including broad prohibitions on the use of food
> crops as GEPPVs and prohibitions on the outdoor growing of
> GEPPVs in order to prevent unauthorized exposures and to
> prevent future contamination of the food supply and the
> environment by unwanted pharmaceutical and chemical
> compounds.
>
> 2.  Undertake a Programmatic EIS for GEPPVs.  Comply with
> the National Environmental Policy Act by preparing a
> Programmatic Environmental Impact Statement ("PEIS")
> assessing the impacts of alternative future approaches for
> APHIS's regulatory program on GEPPVs.  The reasonable
> alternative approaches assessed should include, but not be
> limited to, regulatory prohibitions on the use of food crops as
> GEPPVs and on further outdoor planting of GEPPVs.
>
> 3.  Change Existing [United States Department of Agriculture
> ("USDA")] CBI and FOIA Policies and Regulations.  Change
> USDA and APHIS's policies and regulations on confidential
> business information ("CBI") and the Freedom of Information
> Act ("FOIA") to provide more prompt, comprehensive

responses and to facilitate prompt disclosure of all relevant CBI when a party who has claimed the CBI protections violates APHIS's containment rules and causes an unauthorized exposure of any person, the grain or food supply, or the environment to a GEPPV.

4. <u>Create a Publicly Available Field Test Violations Database</u>. Maintain an updated list on the APHIS website of all containment violations for GEPPVs, including name of the violator; date of violation; precise location and extent of any contamination; specific identity of the GEPPV involved; response actions by APHIS, the violator, and other entities; and other pertinent information.

5. <u>Institute an Immediate Moratorium on Certain Plantings</u>. Institute an immediate moratorium on all use of food crops as GEPPVs, and all further outdoor planting of GEPPVs, to allow for the development of the requested regulations, the PEIS, and the improved public disclosure program. While these program improvements are pending APHIS should, with respect to any proposed uses of food crops as GEPPVs and proposed outdoor GEPPV plantings: (1) deny all notifications; (2) deny all applications for permits; and (3) deny all petitions for deregulated status.

Plaintiffs' Concise, Ex. 18 at 2-3.

On March 10, 2003, APHIS requested public comments on its permitting process for the field testing of plants genetically engineered to produce pharmaceutical and industrial compounds. AR 1527 (also available at 68 FR 11337-01). APHIS received over 6,000 comments from individuals and organizations opposed, to varying degrees, to the concept of field testing of GEPPVs. AR 1531-2441; *see also* AR 2442-64 (summary of public comments).

21

On April 17, 2003, APHIS sent the Plaintiffs a letter responding to the Plaintiffs' December 16, 2002 Petition. AR 3021-24. The Plaintiffs claim that this letter was not a "response" in that APHIS neither granted nor denied the Plaintiffs' requests; instead, according to the Plaintiffs, APHIS simply dismissed the Plaintiffs' concerns and have, to date, refused to act on the Plaintiffs' requests. The court requested and received supplemental briefing as to what, if anything, APHIS did in response to the Plaintiffs' Petition. In its Additional Briefing on Plaintiffs' Petition for Rulemaking (hereinafter "APHIS's First Supplemental Brief"), APHIS explained that it has done the following: (1) it published a notice of intent ("NOI") in the Federal Register on January 23, 2004 to "prepare an [EIS] in connection with potential changes to the regulations regarding the importation, interstate movement, and environmental release of certain genetically engineered organisms"; (2) it has been working on a Draft EIS since publishing the NOI and this Draft EIS "is currently being reviewed both internally at the USDA as well as at other governmental agencies"; and (3) it has established several web pages dedicated to GEPPV permitting. 69 FR 3271; Declaration of John T. Turner, Ph.D. (attached to APHIS's First Supplemental Brief). APHIS's First Supplemental Brief also lists a number of reasons why APHIS believes its existing policies address the Plaintiffs' concerns, but the only concrete actions identified

by APHIS's brief are the three items just mentioned.  For example, as to Item 3 in

the Plaintiffs' Petition (requesting that APHIS change existing CBI and FOIA

policies), APHIS's April 17, 2003 letter stated that APHIS is legally required to

protect CBI but that APHIS would make information available to the public for

those containment violations that have "'potential environmental and health

risks.'"  AR 3023.  APHIS does not identify any specific actions taken by APHIS

with respect to the Plaintiffs' Item 3 since issuance of the April 2003 letter,

however.  Similarly, as to Item 4 in the Plaintiffs' Petition (requesting creation of a

field test violations database), APHIS claims that it has established some websites

containing permit information; APHIS does not allege that it has taken any action

with respect to a publicly available database of *all* field test *violations*, as

requested by the Plaintiffs.  As to Item 5 in the Plaintiffs' Petition (requesting an

immediate moratorium), the April 17, 2003 letter stated that "[f]ield tests of

GEPPVs have been conducted safely to date under conditions of confinement" but

that "[a]n immediate moratorium on the use of food crops for GEPPVs and/or field

testing of GEPPVs would be considered . . . should a series of unforeseen

circumstances warrant such action[.]" AR 3023-24.  In its First Supplemental

Brief, however, APHIS does not explain what (if anything) it has done since April

2003 with respect to Item 5 of the Plaintiffs' Petition.

C.   Procedural Background

The Plaintiffs filed their Complaint in November 2003, and filed a

First Amended Complaint in February 2004.  Court Record ("CR") 1, 154.  The

Biotechnology Industry Organization ("BIO") -- a nonprofit trade association that

represents over 1,100 biotechnology companies -- filed a motion to intervene in

April 2004; Magistrate Judge Barry Kurren granted in part and denied in part

BIO's request, ruling that BIO could intervene "with respect to discovery issues

regarding information on BIO's members and issues of injunctive relief."  CR 29,

63.  United States District Court Judge David Alan Ezra affirmed the Magistrate

Judge's ruling.  CR 75.  The Defendants filed several motions to dismiss, which

Judge Ezra denied in written orders dated January 26, 2005, March 2, 2005, and

July 18, 2005.  CR 117, 127, 151.

The Plaintiffs filed a Second Amended Complaint on August 1, 2005.

CR 154.  The Plaintiffs and the Defendants filed motions for summary judgment,

and the court heard arguments on the motions on July 7, 2006.[8]  On July 11, 2006,

---

[8] The Plaintiffs and BIO each filed a motion to strike in the weeks before the hearing on the parties' motions for summary judgment, and the court denied those motions without prejudice.  These motions to strike related to the parties' use of extra-record evidence; the court denied the motions to strike, but informed the parties that it would consider the parties' concerns once the court had a better understanding of the facts of the case (and thus a better understanding of the context of the extra-record evidence).

As the Ninth Circuit has explained, "[j]udicial review of an agency decision typically

(continued...)

the court requested additional briefing from the parties as to Count Eleven of the

Plaintiffs' Second Amended Complaint (the Plaintiffs' Plant Protection Act

claim).[9]

────────────────

[8](...continued)
focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). There are four situations in which extra-record evidence may be considered:

> (1)  when the record need be expanded to explain agency action;
> (2)  when the agency has relied upon documents or materials not included in the record;
> (3)  to explain or clarify technical matter involved in the agency action and
> (4)  where there has been a strong showing in support of a claim of bad faith or improper behavior on the part of the agency decision makers.

*Cactus Corner, LLC v. U.S. Dept. of Agric.*, 346 F. Supp. 2d 1075, 1105 (E.D. Cal. 2004) (paraphrasing *Pub. Power Council v. Johnson*, 674 F.2d 791 (9th Cir. 1982)). *See also Southwest Ctr. for Biological Diversity*, 100 F.3d at 1450 ("Review may, however, be expanded beyond the record if necessary to explain agency decisions."). In reaching the conclusions set forth below, the court has not relied upon any of the extra-record evidence that was the subject of the parties' motions to strike. The court has, however, considered two pieces of extra-record evidence submitted by the parties:  the declaration of John T. Turner, Ph.D. (attached to APHIS's First Supplemental Brief), which discusses APHIS's progress on the Programmatic EIS, and Exhibit 1 to the Plaintiffs' Supplemental Brief Regarding APHIS's Response to Plaintiff's December 16, 2002 Petition, which lists thirty-eight permits issued by APHIS since the Plaintiffs submitted their Petition on December 16, 2002. The court finds that these extra-record documents are necessary to explain APHIS's actions over the last three and a half years so as to allow the court to rule on APHIS's ripeness argument.

Additionally, at the August 22, 2006 hearing, counsel for APHIS stated that he was orally moving to strike certain exhibits attached to the Plaintiffs' Supplemental Brief Regarding Remedies. This motion is denied.

[9] On August 10, 2006, the court entered an Order granting in part and denying in part the Plaintiffs' and Defendants' motions for summary judgment:  the court granted summary judgment in favor of the Plaintiffs as to Counts One through Four and Six through Nine and in favor of the Defendants as to Count Eleven, and the court withheld ruling as to Counts Five and

(continued...)

## III.  STANDARD OF REVIEW

Pursuant to the APA, the court reviews APHIS's actions to determine whether those actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  As the Ninth Circuit has explained, "[a]n agency decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 937 (9th Cir. 2006) (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001)) (alteration in original).  *See also Alaska Ctr. for the Env't*, 189 F.3d at 858 n.5 ("The question of whether an action . . . fits within the categorical exclusion is a factual determination that implicates substantial agency expertise and is reviewed under the arbitrary and capricious standard.").

---

[9](...continued)
Ten because the parties had not clearly articulated their positions with respect to these Counts.  In its August 10, 2006 order, the court requested additional briefing as to (1) the parties' positions on Counts Five and Ten and (2) the parties' views as to the appropriate remedies in this case.  On August 22, 2006, the court heard arguments on these two matters.

The focus of the Plaintiffs' Second Amended Complaint is on APHIS's alleged failure to comply with the procedures mandated in the ESA, NEPA, and APA. "Unlike substantive challenges, . . . our review of an agency's procedural compliance is exacting, yet limited." *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). "The court must defer to an agency conclusion that is 'fully informed and well-considered,' but need not rubber stamp a 'clear error of judgment.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998)). Furthermore, as the Supreme Court explained in *Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196 (1947):

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

## IV.  <u>DISCUSSION</u>

In its Second Amended Complaint, the Plaintiffs allege the following: (1) APHIS violated NEPA and the ESA in issuing each of the four permits at issue in this case (Counts One through Four and Six through Nine, respectively);

27

(2) APHIS violated NEPA and the ESA in implementing its "GEPPV program" (Counts Five and Ten, respectively); and (3) APHIS violated the PPA and the APA in failing to respond to the Plaintiffs' Petition (Count Eleven).

In Sections A and B, the court examines the Plaintiffs' claims that issuance of the four permits violated the ESA and NEPA, respectively; the court grants summary judgment in favor of the Plaintiffs.  In Section C, the court addresses the Plaintiffs' claims that APHIS's "GEPPV program" violated the ESA and NEPA; the court grants summary judgment in favor of APHIS.  In Section D, the court considers the Plaintiffs' PPA rulemaking claim; the court grants summary judgment in favor of APHIS.  Finally, in Section E, the court considers the appropriate remedies in this case and concludes that injunctive relief is not appropriate as to those Counts on which the Plaintiffs prevail.

A.    Endangered Species Act

Hawaii is known not only for its remarkable landscape and beaches, but also for its considerable number of endangered and threatened species.  The Fish and Wildlife Service reports on its website that there are 329 endangered and threatened plant and animal species in Hawaii, including thirty-two types of

birds.[10]  Hawaii has more endangered and threatened species than any other state, and Hawaii's 329 listed species represent approximately twenty-five percent of all listed species in the United States.[11]  Although strict compliance with the ESA's procedural requirements is always critically important, these requirements are particularly crucial in Hawaii given Hawaii's extensive number of threatened and endangered species.

As discussed *supra*, 16 U.S.C. § 1536(c)(1) requires all agencies -- including APHIS -- to obtain information from FWS and NMFS about any "listed" species in the geographic area of the proposed agency action.  This initial request for information is a predicate to further agency action and may not be ignored, regardless of whatever other processes the agency follows.  *See Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) (holding that ESA's "procedural requirements are designed to ensure compliance with the substantive provisions").

APHIS argues that it complied with the ESA in issuing the four

---

[10] *See* FWS Threatened and Endangered Species System ("TESS"), http://ecos.fws.gov/tess_public/StateListing.do?state=HI&status=listed (last visited Aug. 31, 2006) (listing 273 plants and 56 animals in Hawaii as endangered or threatened); FWS, Pacific Islands -- Endangered Species, http://www.fws.gov/pacificislands/wesa/endspindex.html#Hawaiian (last visited Aug. 31, 2006) (describing Hawaii's endangered species).

[11] *See* FWS TESS, http://ecos.fws.gov/tess_public/StateListing.do?state=all (last visited Aug. 31, 2006).  Hawaii has 329 threatened and endangered plant and animal species out of a total of 1,310 in the United States.  *See* FWS TESS, http://ecos.fws.gov/tess_public/Boxscore.do (last visited Aug. 31, 2006).

permits.  APHIS points to 50 C.F.R. § 402.14, which provides that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat"; APHIS argues that it determined that its proposed actions would not affect listed species or critical habitat, such that formal consultation was not required.

APHIS's argument misses the mark.  The problem is not with APHIS's decision not to conduct a formal consultation:  APHIS may ultimately be correct that formal consultation was not required (though the court makes no findings on this point), but this is not the real issue.  Instead, the problem is that APHIS skipped the initial, mandatory step of obtaining information about listed species and critical habitats from FWS and NMFS.

At the July 7, 2006 hearing, the court questioned APHIS's counsel directly and repeatedly as to whether the initial step outlined in § 1536(c)(1) (obtaining information about listed species from FWS) was required and, if so, whether APHIS complied with this procedural requirement.  APHIS's counsel did not answer these questions.  Instead, counsel simply reiterated that "formal consultation" was not required, ignoring the court's questions about the pre-consultation, information-gathering procedure required by the ESA.

Regardless of whether the field tests of the genetically modified crops were "confined" (as discussed more fully *infra*), and regardless of whether APHIS's actions were in fact innocuous with respect to listed species and habitats, APHIS violated the ESA. APHIS engaged in "agency action" -- granting a series of permits to field test genetically modified crops -- without fulfilling its congressionally mandated duty to obtain information from FWS and NMFS regarding endangered species, threatened species, and critical habitats. Even if APHIS is ultimately correct in its assertion that no listed species or habitats have been harmed, APHIS's actions are nevertheless tainted because APHIS failed to comply with a fundamental procedural requirement. APHIS's utter disregard for this simple investigation requirement, especially given the extraordinary number of endangered and threatened plants and animals in Hawaii, constitutes an unequivocal violation of a clear congressional mandate.

In an apparent effort to mitigate, APHIS turns to its second argument: "No harm, no foul." APHIS argues that, because the Plaintiffs have not provided any evidence to show that a single listed species or habitat was harmed in any way, the Plaintiffs' claims necessarily fail. This argument is absurd. An agency violates the ESA when it fails to follow the procedures mandated by Congress, and an agency will not escape scrutiny based on the fortunate outcome that no listed

plant, animal, or habitat was harmed.  APHIS's argument essentially asks the court

to believe that APHIS is immune from suit, no matter how egregious the violation

of the ESA, so long as APHIS does not cause any substantive harm to any listed

species or habitat.  In other words, APHIS argues that the Plaintiffs may not

proceed with a lawsuit against the agency unless APHIS actually facilitates an

organism's extinction.  This after-the-fact justification (and good fortune) cannot

absolve APHIS of its failure to follow a clear congressional mandate.  *See*, *e.g.*,

*Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005)

("'It is not the responsibility of the plaintiffs to prove, nor the function of the

courts to judge, the effect of a proposed action on an endangered species when

proper procedures have not been followed.'" (Quoting *Thomas*, 753 F.2d at 765.

1985).)).  As the Ninth Circuit has explained:

> The ESA's procedural requirements call for a systematic
> determination of the effects of a federal project on endangered
> species.  If a project is allowed to proceed without substantial
> compliance with those procedural requirements, there can be
> no assurance that a violation of the ESA's substantive
> provisions will not result.  The latter, of course, is
> impermissible.

*Thomas*, 753 F.2d at 764.  In sum, the Defendants' argument is utterly without

merit.  The court therefore grants summary judgment in favor of the Plaintiffs as to

Counts Six, Seven, Eight, and Nine of the Second Amended Complaint.

32

B.    National Environmental Policy Act

The court concludes that APHIS violated NEPA because APHIS

failed to articulate its reasons for declining to prepare an EA or EIS.  There is

nothing in the administrative record to indicate that, contemporaneously with the

issuance of the four permits, APHIS considered the applicability of NEPA,

categorical exclusions, or the exceptions to those exclusions.  In other words,

APHIS failed to provide a reasoned explanation for its apparent determinations

that a categorical exclusion applied and that the exceptions to the exclusion did

not apply.  Consequently, APHIS's actions -- granting the four permits -- were

arbitrary and capricious.

### 1.    APHIS cannot rely on a categorical exclusion post hoc

The court could find nothing in the administrative record to indicate

that APHIS considered NEPA when deciding whether to issue the four permits.

Nowhere in the administrative record does APHIS discuss the applicability of the

categorical exclusion or the exceptions to that exclusion.  As the Ninth Circuit has

explained:

> It is difficult for a reviewing court to determine if the
> application of an exclusion is arbitrary and capricious where
> there is no contemporaneous documentation to show that the
> agency considered the environmental consequences of its
> action and decided to apply a categorical exclusion to the facts

> of a particular decision. Post hoc invocation of a categorical
> exclusion does not provide assurance that the agency actually
> considered the environmental effects of its action before the
> decision was made.

*Cal. v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002).  At a bare minimum, an

agency must state -- at the time it engages in the action in question (and not just

when engaged in subsequent litigation) -- that it is invoking a categorical

exclusion.  *See id.* ("In many instances, a brief statement that a categorical

exclusion is being invoked will suffice.").  The court has no doubt that the

members of APHIS's staff are, in fact, quite familiar with NEPA's requirements;

nevertheless, the court must review the administrative record, and the record itself

is devoid of any consideration of the environmental consequences of APHIS's

actions.

Although APHIS did not explicitly reference NEPA in the

administrative record, there is evidence indicating that APHIS believed the

permits involved "confined" field tests and that the categorical exclusion in 7

C.F.R. § 372.5(c)(3)(ii) ("[p]ermitting . . . confined field releases of genetically

engineered organisms") applied.  As discussed *supra*, the administrative record

contains four letters (one for each of the four permits) from APHIS to the State of

Hawaii indicating that APHIS believed these field tests were "confined" within the

34

meaning of the PPA.  APHIS argues that a categorical exclusion applied (that is,

APHIS argues that it was not required to prepare an EA or an EIS because

issuance of the four permits fell within a categorical exclusion) because "the

means through which adverse environmental impacts may be avoided or

minimized have actually been built right into the [agency] actions themselves" --

specifically, because the four permits involved "confined field releases of

genetically engineered organisms[.]"  7 C.F.R. §§  372(c), 372(c)(3)(ii).  In other

words, APHIS argues that the four permits fit within its broad categorical

exclusion in 7 C.F.R. § 372.5(c) (environmental mitigation measures built into the

agency action itself) and its own more specific categorical exclusion in 7 C.F.R.

§ 372.5(c)(3)(ii) ("confined field releases of genetically engineered organisms").

Given that APHIS's regulations allow for a categorical exclusion for

"[p]ermitting, or acknowledgement of notifications for, confined field releases of

genetically engineered organisms and products," 7 C.F.R. § 372.5(c)(3)(ii), and

given that APHIS made a clear determination as to each permit application that the

proposed field test was "confined" or "controlled," this court would have been

satisfied had APHIS explained itself in any reasonable fashion as to the

applicability of this categorical exclusion.  *See Alaska Ctr. for the Env't v. U.S.*

*Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999) ("[A]n agency's interpretation of

the meaning of its own categorical exclusion should be given controlling weight

unless plainly erroneous or inconsistent with the terms used in the regulation.").

APHIS cannot, however, abdicate its responsibilities during the administrative

process and expect the court to defer to the agency's post hoc explanations.  *See*

*Cal. v. Norton*, 311 F.3d at 1176 ("Post hoc invocation of a categorical exclusion

does not provide assurance that the agency actually considered the environmental

effects of its action before the decision was made.").  Furthermore, the fact that a

field test is "confined" or "controlled" for purposes of the PPA does not

necessarily mean that the field test is "confined" within the meaning of the

categorical exclusion within APHIS's NEPA regulations.  While there may be

substantial or complete overlap between 7 C.F.R. Part 340 and 7 C.F.R.

§ 372.5(c)(3)(ii), there must be some indication in the administrative record that

APHIS considered the environmental consequences of its actions.  NEPA requires

no less.

APHIS's effort to justify its actions falls short.  APHIS points to a

footnote in *Alaska Center for the Environment* for the proposition that an agency

may explain its rationale for applying a categorical exclusion post hoc.  Simply

put, *Alaska Center for the Environment* does not say what the Defendants think it

does.[12]  The Defendants also rely on *Cactus Corner, LLC v. U.S. Department of Agriculture*, 346 F. Supp. 2d 1075, 1122 (E.D. Cal. 2004), for the same notion (that an agency need not explain its decision to apply a categorical exclusion). The facts of *Cactus Corner* are distinguishable from those in the instant case, however.  In *Cactus Corner*, the court recognized that "'[p]ost hoc invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made.'" *Id.* at 1122 (quoting *Cal. v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002)).  The court then explained:

> Here, by contrast, the nature and purpose of the [APHIS] Rule itself [regarding the importation of clementines], aimed at the prevention of Medfly introduction into the United States, is

---

[12] The Defendants cite the following footnote from *Alaska Center for the Environment*:

> ACE also contends that the Forest Service is avoiding NEPA review by breaking proposed actions down into one-year temporary actions so as to fit within the categorical exclusion and not complete an EA. The question of whether an action is temporary and fits within the categorical exclusion is a factual determination that implicates substantial agency expertise and is reviewed under the arbitrary and capricious standard. [*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992).] The Forest Service's categorization of one-year helicopter permits as temporary is not unreasonable or does not rise to the level of arbitrary and capricious.

*Alaska Ctr. for the Env't*, 189 F.3d at 858 n.5.  The court disagrees with the Defendants that this footnote somehow eviscerates established Ninth Circuit law, discussed *supra*, that post hoc rationalizations are insufficient to survive the arbitrary and capricious standard.

> designed to protect human health and the environment.  Its risk
> analyses adequately address all issues of environmental
> concern, particularly the threat of the spread of Medflies, the
> risk to plant life (crops), and the risk to consumers who could
> encounter larvae in a fruit.  Any additional study as to the
> environmental impact of Medfly introduction would be
> repetitive of the agency's 2001 Environmental Assessment and
> resulting statement.

*Id.*  APHIS does not argue that the "nature and purpose" of the four permits at

issue in the instant case was to "protect human health and the environment."

Furthermore, there is nothing to suggest that additional study or analysis by

APHIS would have been repetitive or redundant in this case.  APHIS simply did

not do the type of analysis required by NEPA.

The court is mindful of the Supreme Court's mandate that, "[e]ven

when an agency explains its decision with 'less than ideal clarity,' a reviewing

court will not upset the decision on that account 'if the agency's path may

reasonably be discerned.'" *Alaska Dep't of Envtl. Conservation v. Envtl. Prot.*

*Agency*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v.*

*Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  To accept APHIS's

argument in the instant case, however, the court either must guess at what APHIS

38

meant or must accept APHIS's post hoc rationalization. Neither of these alternatives is acceptable.[13]

Based on the administrative record, the court concludes that APHIS's issuance of the four permits -- without an EA, an EIS, or an explanation as to why neither an EA nor an EIS was required -- was arbitrary and capricious. Furthermore, as explained in the following section, APHIS's issuance of the four permits without considering the exceptions to the applicable categorical exclusion was also arbitrary and capricious.

2.    **APHIS's failure to consider the exceptions to the categorical exclusion renders APHIS's actions arbitrary and capricious**

The categorical exclusion outlined in 7 C.F.R. § 372.5(c)(3)(ii), discussed *supra*, is subject to the exceptions outlined in 7 C.F.R. § 372.5(d), including the requirement that an EA or EIS must be prepared "[w]hen a confined field release of genetically engineered organisms or products involves new species or organisms or novel modifications that raise new issues." The Plaintiffs argue

---

[13] APHIS also argued that it should be held to a lower standard because this was "informal" rather than "formal" agency action. This argument is similarly without merit. The court agrees with APHIS that no formal NEPA document was required and that, as a general rule, an agency action will survive the arbitrary and capricious standard even if the agency was disorganized in performing its review. Nevertheless, an agency action will not survive judicial review where the administrative record fails to reflect any consideration of environmental harm as required by NEPA.

that this exception applies to the four permits at issue, such that APHIS violated

NEPA by failing to prepare an EA or EIS.

As the Ninth Circuit has explained, "[w]here there is substantial

evidence in the record that exceptions to the categorical exclusion may apply, the

agency must at the very least explain why the action does not fall within one of the

exceptions." *Cal. v. Norton*, 311 F.3d at 1177.  In the instant case, whether the

exception in 7 C.F.R. § 372(d)(4) *does* apply is unclear, but there is substantial

evidence that it *may* apply.  Applications and correspondence submitted by two of

the four permittees state that the proposed field tests involve "novel" proteins.  AR

11-17, 23-29, 42-43 (ProdiGene application repeatedly stating that the molecular

biology of various plants had been altered so as to "[e]xpress[] a novel protein");

AR 600 (Monsanto memorandum to APHIS stating that "[t]he information

enclosed with this document is in support of our request to amend the previously

approved application . . . for environmental release of transgenic corn containing

vectors for novel proteins"); AR 699 (Monsanto memorandum discussing

application for "particular genes of interest . . . categorized as novel proteins").

Whether the remaining two permit applications involve "novel modifications" that

"raise new issues" is unclear.  While the idea of genetically modifying food crops

to produce experimental pharmaceutical products may certainly appear "novel" to

40

a layperson, this court lacks the expertise to make this kind of determination.

Whether the proposed field tests involve "novel modifications," and whether these

modifications "raise new issues," are questions best left to APHIS; the court will

defer to APHIS's judgment on these issues, but APHIS must articulate a reasoned

decision based on the information available to it.  *See High Sierra Hikers Ass'n v.*

*Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) ("NEPA is a procedural statute that

does not 'mandate particular results, but simply provides the necessary process to

ensure that federal agencies take a hard look at the environmental consequences of

their actions.'"(Quoting *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d

1059, 1070 (9th Cir. 2002).)).

     In the instant case, APHIS has simply failed to provide *any*

explanation for its implied determination that the exceptions to the categorical

exclusion do not apply.  This is not the type of reasoned decisionmaking required

of federal agencies, and it cannot stand.  The court finds that there is substantial

evidence that an exception to the categorical exclusion *may* apply and that APHIS

was required to provide *some* explanation as to why, in its view, the exceptions

did not apply.  Consequently, the court concludes that APHIS's issuance of the

four permits, without considering the exceptions to the categorical exclusions, was

arbitrary and capricious.  Therefore, the court grants summary judgment in favor

41

of the Plaintiffs as to Counts One, Two, Three, and Four of the Second Amended

Complaint.

C.    The "GEPPV Program"

           The Plaintiffs argue that APHIS did more than just issue a series of

individual permits:  they argue that APHIS developed and implemented an

organized, national program (with coordinated policies, protocols, and

regulations) and that APHIS was required by NEPA and the ESA to study the

impact of this program on the environment and endangered species.  The Plaintiffs

contend that APHIS's failure to consider the cumulative impact of its national

GEPPV program constitutes a separate violation of NEPA and the ESA (Counts

Five and Ten, respectively, of the Plaintiffs' Second Amended Complaint).

APHIS argues that there was no "final agency action" for purposes of the NEPA

claim and no "agency action" for purposes of the ESA claim, such that the

Plaintiffs' claims necessarily fail.  The court agrees with APHIS.  The court first

examines the NEPA claim and then turns to the ESA claim.

    1.    NEPA

           The APA provides that "[a]gency action made reviewable by statute

and final agency action for which there is no other adequate remedy in a court are

subject to judicial review."  5 U.S.C. § 704.  *See also* 5 U.S.C. § 551(13)

("'[A]gency action' includes the whole or a part of an agency rule, order, license,

sanction, relief, or the equivalent or denial thereof, or failure to act[.]'"); 5 U.S.C.

§ 702 ("A person suffering legal wrong because of agency action, or adversely

affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof.").   The Supreme Court has clarified the phrase

"final agency action":

> As a general matter, two conditions must be satisfied for
> agency action to be "final":  First, the action must mark the
> "consummation" of the agency's decisionmaking process,
> *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
> 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948)--it
> must not be of a merely tentative or interlocutory nature.  And
> second, the action must be one by which "rights or obligations
> have been determined," or from which "legal consequences
> will flow," *Port of Boston Marine Terminal Assn. v.
> Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct.
> 203, 209, 27 L.Ed.2d 203 (1970).

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).[14]

---

[14] The CEQ implementing regulations further explain the types of actions subject to
NEPA's requirements:

> (a) Actions include new and continuing activities, including projects and
> programs entirely or partly financed, assisted, conducted, regulated, or
> approved by federal agencies; new or revised agency rules, regulations,
> plans, policies, or procedures; and legislative proposals (§§ 1506.8,
> 1508.17). . . .
>
> (b) Federal actions tend to fall within one of the following categories:
>
> (1) Adoption of official policy, such as rules, regulations, and

(continued...)

The Supreme Court has applied this standard to the exact type of situation presented by the instant case, in which a plaintiff alleges that an agency has a coordinated series of policies by which it operates and that this coordinated series of policies constitutes "final agency action."  In *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990), the National Wildlife Federation alleged, *inter alia*, that the Bureau of Land Management ("BLM") had a "land withdrawal review program" and that BLM violated NEPA by failing to prepare an EIS in connection with this program.  The Supreme Court rejected this claim:

> Respondent [National Wildlife Federation] alleges that
> violation of the law is rampant within this program . . . .

---

[14](...continued)
interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18.

> Perhaps so.  But respondent cannot seek *wholesale*
> improvement of this program by court decree, rather than in the
> offices of the Department [of the Interior] or the halls of
> Congress, where programmatic improvements are normally
> made.  Under the terms of the APA, respondent must direct its
> attack against some particular "agency action" that causes it
> harm.  Some statutes permit broad regulations to serve as the
> "agency action," and thus to be the object of judicial review
> directly, even before the concrete effects normally required for
> APA review are felt.  Absent such a provision, however, a
> regulation is not ordinarily considered the type of agency
> action "ripe" for judicial review under the APA until the scope
> of the controversy has been reduced to more manageable
> proportions, and its factual components fleshed out, by some
> concrete action applying the regulation to the claimant's
> situation in a fashion that harms or threatens to harm him.

*Id.* at 891.  The Court held that a case-by-case approach, while "understandably

frustrating" for the National Wildlife Federation, was required because Congress

had not explicitly provided for judicial review of general agency policy.  *Id.* at

894.

In *Northcoast Environmental Center v. Glickman*, 136 F.3d 660 (9th

Cir. 1998), the Ninth Circuit applied the *National Wildlife Federation* "final

agency action" standard with similar results.  The court held that a coordinated,

inter-agency management plan for the Port-Orford cedar ("POC"), a type of cedar

tree found in Oregon and California, was not "final agency action" subject to

judicial review.  Although the management plan "set forth guidelines and goals for

45

POC research, management strategies and information sharing" and "provide[d] management strategies and goals for dealing with POC preservation and timber sales on BLM managed land," these guidelines and goals were not "final agency action" because they "d[id] not provide for specific activities with a direct impact on POC" and "neither propose[d] any site-specific activity nor [called] for specific actions directly impacting the physical environment." *Id.* at 669-70.

The instant case falls squarely in the shadow of *National Wildlife Federation* and *Northcoast Environmental Center*. The Plaintiffs allege that APHIS has a national "GEPPV program" and that this national program has a substantial environmental impact. As evidence of this program, the Plaintiffs point to four items or classes of items: (1) several portions of APHIS's website, which, among other things, discusses how its "Biotechnology Regulatory Services" program (referred to as "APHIS-BRS") "protects America's agriculture and environment using a dynamic and science-based regulatory framework that allows for the safe development and use of genetically engineered organisms";[15] (2) a document entitled "The Role of USDA in Plant 'Pharming,'" which explains the role of APHIS-BRS and describes, in broad terms, APHIS's procedures for

---

[15] "About APHIS -- Biotechnology Regulatory Services," http://www.aphis.usda.gov/subjects/biotechnology/index.shtml (last visited Aug. 31, 2006).

issuing permits;[16] (3) APHIS's PPA regulations (7 CFR Part 340); and (4)

APHIS's publication of a notice of intent ("NOI") in the Federal Register on

January 23, 2004, indicating that APHIS was beginning the programmatic EIS

process (and demonstrating, according to the Plaintiffs, that APHIS had a

"program" all along but was avoiding its duty to develop a programmatic EIS).[17]

            The court is not persuaded.  As for items one and two, it is clear that

APHIS has some internal policies and procedures by which it operates.  For

example, the permit conditions of the four permits at issue in this case are very

similar (though not identical), suggesting that APHIS does have coordinated,

internal protocols relating to the issuance of permits.  But neither of these items

"propose[s] any site-specific action nor . . . call[s] for specific actions directly

impacting the physical environment."  *Northcoast Envtl. Ctr.*, 136 F.3d at 670.  An

agency's decision to publicly share its internal guidelines and policies does not

automatically mean that "final agency action" exists.  Obviously, federal agencies

routinely develop internal procedures and protocols in attempting to fulfill their

statutory duties, but as *National Wildlife Federation* and *Northcoast*

*Environmental Center* demonstrate, these procedures and protocols do not rise to

---

[16] AR 2468-85.

[17] 69 FR 3271.

the level of "final agency action" for purposes of NEPA unless the agency engages in some activity with some direct impact on the environment.  Thus, even if the Plaintiffs are correct that "APHIS, through its program, promotes and oversees the development and testing of GEPPVs," Plaintiffs' Supplemental Brief Regarding Remedies at 5, the Plaintiffs have not pointed to any "final agency action," apart from issuance of the four permits, that allows for judicial review.

Similarly, the court is unpersuaded that APHIS's PPA regulations evince a broader "GEPPV program" that, in turn, constitutes "final agency action." The Plaintiffs admit that they are not bringing a facial challenge to the regulations themselves; instead, they appear to argue that the regulations, when viewed in concert with APHIS's internal procedures and protocols, constitute a "final agency action" subject to judicial review.  Plaintiffs have failed to demonstrate, in their briefing and in oral argument, how these regulations have transformed internal procedures into a "final agency action."

The Plaintiffs' fourth argument -- that APHIS's programmatic EIS ("PEIS"), currently underway, demonstrates that APHIS has always had a "GEPPV program" -- is similarly without merit.  The Plaintiffs would have the court believe that, any time an agency decides to conduct a PEIS, all agency activity that preceded the PEIS necessarily violated NEPA (because the agency

was "acting" without a PEIS in place). If the court were to agree with the

Plaintiffs, agencies would have a tremendous disincentive to prepare

programmatic environmental impact statements because, according to the

Plaintiffs, initiation of the PEIS process is essentially an admission that the agency

had been violating NEPA prior to initiating the PEIS process. The law is clear as

to when a PEIS must be prepared, and no PEIS was necessary for the agency

activity relied upon by the Plaintiffs. The fact that APHIS decided to initiate a

PEIS does not demonstrate that APHIS engaged in "final agency action" before

beginning the PEIS.

　　　　The Plaintiffs have failed to produce any evidence or point to any

genuine issue of material fact demonstrating that there is a reviewable agency

action. None of the four items relied upon by the Plaintiffs -- either individually

or cumulatively -- shows that the "GEPPV program" is "final agency action"

sufficient to allow for judicial review under the APA. *See Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates

the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."); *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th

Cir. 1995) (holding that, in NEPA cases, "[t]he party challenging the agency action also bears the burden of proof").  Because there is no "final agency action" for the court to review, APHIS is entitled to summary judgment as to Count Five.

## 2.    ESA

As discussed *supra*, the ESA contains a broad citizen suit provision. Consequently, the Plaintiffs' ESA claim is not limited by the "final agency action" restriction applicable to the NEPA claim.  16 U.S.C. § 1540(g)(1)(A). Nevertheless, federal agencies are only required to comply with the ESA's procedural requirements when an agency proposes an "agency action"; again, 16 U.S.C. § 1536(a)(2) defines "agency action" as "any action authorized, funded, or carried out by such agency" and the regulations implementing the ESA provide that "'[a]ction' means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas."  50 C.F.R. § 402.02.  *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (stating that the language in § 1536(a)(2) "admits of no exception"); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998) ("The term 'agency action' has been defined broadly.").

The Plaintiffs do not present any additional arguments, beyond those presented for Count Five (NEPA), as to why the purported "GEPPV program" is

an "agency action" under ESA; the Plaintiffs argue that the same four items or

classes of items set forth *supra* (APHIS's website, the document entitled "The

Role of USDA in Plant 'Pharming,'" APHIS's PPA CFR regulations, and

APHIS's decision to initiate a PEIS) prove agency action under both NEPA and

the ESA.  Once again, the court is not persuaded by these arguments.  Although

ESA provides a slightly broader definition of "agency action" than NEPA, the

ESA, like NEPA, still contemplates something more tangible than internal agency

protocols and policies.  Even if the Plaintiffs are correct that APHIS has

established an organized method of running a "GEPPV program," the court fails to

see how these coordinated polices and regulations constitute an "agency action"

separate and distinct from APHIS's action in issuing the individual permits.  In

sum, the Plaintiffs have failed to produce evidence of an "agency action," and with

no "agency action," there can be no violation of the ESA (because an agency is

only required to comply with the ESA's procedural requirements where the agency

proposes to engage in "agency action").  Consequently, the court grants summary

judgment in favor of APHIS as to Count Ten of the Plaintiffs' Second Amended

Complaint.

//

D.      Plant Protection Act

        In Count Eleven of their Second Amended Complaint, the Plaintiffs

contend that APHIS has essentially denied their December 16, 2002 Petition and

that this effective denial was arbitrary and capricious.[18]  The Defendants argue that

APHIS never denied the Petition, such that the Plaintiffs' claims are unripe.  The

Plaintiffs' Petition raises five issues, and the court will address each of these five

issues in turn.  The court concludes that Items 1 and 2 of the Plaintiffs' Petition

("Promulgate New GEPPV Regulations" and "Undertake a Programmatic EIS for

GEPPVS") are unripe, and the court grants summary judgment in favor of the

Defendants as to these issues.  The court finds that Items 3, 4, and 5 of the

Plaintiffs' Petition ("Change Existing USDA CBI and FOIA Policies and

Regulations," "Create a Publicly Available Field Test Violations Database," and

"Institute an Immediate Moratorium on Certain Plantings") were denied by

---

        [18] The Plaintiffs point to *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093,
1099 (D.C. Cir. 1970), which provides:

>        [R]elief delayed is not always equivalent to relief denied.  There are many
>        factors that result in delay, and a court is in general ill-suited to review the
>        order in which an agency conducts its business.  But when administrative
>        inaction has precisely the same impact on the rights of the parties as denial
>        of relief, an agency cannot preclude judicial review by casting its decision
>        in the form of inaction rather than in the form of an order denying relief.

(Footnote omitted.)

APHIS.  Nevertheless, the court concludes that these denials were neither arbitrary nor capricious.  Therefore, the court grants summary judgment in favor of the Defendants as to Items 3, 4, and 5.

**1.    Items 1 and 2 of the Plaintiffs' Petition**

APHIS has submitted evidence indicating that it is conducting the Programmatic EIS requested by the Plaintiffs in Item 2 of their Petition,[19] such that the Plaintiffs' claim is not yet ripe for review.  As the Supreme Court has explained:

> [T]he ripeness requirement is designed
>
> > "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).
>
> In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id.*, at 149, 87 S.Ct., at 1515. To do so in this case, we must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether

------

[19] The court begins by examining Item 2 of the Plaintiffs' Petition, inasmuch as the analysis of Item 1 flows naturally from the disposition of Item 2.

> judicial intervention would inappropriately interfere with
> further administrative action; and (3) whether the courts would
> benefit from further factual development of the issues
> presented.

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998).  *See also*

*Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 850 (9th Cir. 2002) ("[W]e must

determine whether the claims are prudentially ripe, based on two factors:

(1) whether the issues are fit for judicial resolution and (2) the potential hardship

to the parties if judicial resolution is postponed.").  In the instant case, the second

and third *Ohio Forestry* factors weigh strongly in APHIS's favor:  judicial

intervention would inappropriately interfere with APHIS's administrative

proceedings, and the court would benefit from further factual development of the

issues (specifically, completion of the Programmatic EIS).  Although the court

recognizes that this ruling will cause some hardship to the Plaintiffs, insofar as

APHIS continues to issue permits for field testing of GEPPVs, the court concludes

that, taken together, the balance of factors favors APHIS.[20]

---

[20] In July 2005, the Defendants argued that Count Eleven of the Plaintiffs' Amended
Complaint should be dismissed because it was unripe, and Judge Ezra rejected the Defendants'
ripeness argument.  CR 151.  Judge Ezra's Order stated that the "Defendants' alleged delay
would amount to a denial of Plaintiffs' request for a promulgation of regulations" and that the
Plaintiffs' allegations, "if taken as true as required on a motion to dismiss," would entitle the
Plaintiffs to relief.  CR 151.  The standard of review of a motion for summary judgment (under
Rule 56) is different than the standard of review of a motion to dismiss (under Rule 12),
however; the parties have had additional time for discovery and analysis, and the fact that the

(continued...)

Although the Plaintiffs are understandably upset by the fact that this process has taken over three years, the court accepts APHIS's representations regarding the justification for the delay:  scientific research and analysis, along with inter-agency discussions and negotiations, have simply taken a long time (despite APHIS's diligent efforts to move the process along).  The court does not mean to suggest that a three-year delay in preparing an EIS is presumptively valid, nor does the court mean to suggest that APHIS may wait indefinitely.   At the moment, however, the court concludes that the Plaintiffs' claim with respect to Item 2 is unripe and therefore grants summary judgment in favor of the Defendants as to this issue.[21]

The court concludes that the Plaintiffs' claim with respect to Item 1 of their Petition is similarly unripe.  APHIS stated in its April 17, 2003 letter that "[y]our request for the promulgation of new GEPPV regulations, including prohibitions on the use of food crops and outdoor growing of GEPPVs[,] represent one possibility which will be considered, if indicated by the resulting potential for

---

[20](...continued)
court now grants the Defendants' motion for summary judgment on ripeness grounds is in no way inconsistent with Judge Ezra's order denying the Defendants' motion to dismiss on ripeness grounds.

[21] Of course, if APHIS has in any way misrepresented the diligence with which APHIS is conducting this programmatic EIS or the rulemaking process, the Plaintiffs may reassert their claim in a new action.

public health and environmental harm[.]" AR 3022.  Thus, according to APHIS,

whether to promulgate new GEPPV regulations depends on the result of the

Programmatic EIS, which is underway.  Consequently, the court concludes that the

Plaintiffs' claim is unripe and grants summary judgment in favor of the

Defendants.

### 2.   Items 3, 4, and 5 of the Plaintiffs' Petition

#### a.   *APHIS denied Items 3, 4, and 5*

APHIS argues that the Plaintiffs' requests outlined in Items 3, 4, and

5 ("Change Existing USDA CBI and FOIA Policies and Regulations," "Create a

Publicly Available Field Test Violations Database," and "Institute an Immediate

Moratorium on Certain Plantings") have not been denied.  APHIS's First

Supplemental Brief at 11.  The court disagrees.  In its April 17, 2003 letter, and

again in its First Supplemental Brief, APHIS claims that the actions requested in

Items 3, 4, and 5 were and are unnecessary because the existing policies and

procedures are sufficient, although APHIS leaves open the possibility that it would

consider changing its regulations in the future if conditions were to change.  There

is nothing in the letter to indicate that APHIS intended to act on the Plaintiffs'

requests, and there is no evidence that APHIS has acted on the Plaintiffs' requests

in the last three and a half years.

With respect to Item 3 (CBI/FOIA), APHIS's April 17, 2003 letter states that APHIS is constrained by existing law but that APHIS would continue to work diligently to make as much information available to the public as possible. Although APHIS's April 17, 2003 letter did not clearly state that APHIS was denying the Plaintiffs' request, the letter effectively denied the Plaintiffs' requests. Essentially, APHIS's response was "not now, but maybe later." APHIS did not indicate an unequivocal intent to engage in certain actions; instead, APHIS stated that it *might* do something in the future should the right conditions arise. APHIS's statements that it would keep an open mind in the future do not negate these denials. Furthermore, in its First Supplemental Brief, APHIS does not provide any evidence of any agency activity as to Item 3. In short, APHIS denied the Plaintiffs' request on April 17, 2003.

With respect to Item 4, the April 17, 2003 letter stated:

> APHIS is in the process of upgrading the software and hardware used in tracking both inspections and violations under the provisions of 7 CFR Part 340. Our first priority for this revised, inclusive database is to aid in the day to day implementation of the regulations and to ensure compliance. However, we are also in the process of developing an adjunct database which could include the results of compliance inspections and investigations after facts have been verified and any penalties levied. With regard to the need to immediately inform the public about a violation involving GEPPVs, prompt disclosure requires the use of the press

> release as the most effective means for immediate
> dissemination of information to the press and the public.

AR 3023.  In its First Supplemental Brief, APHIS does not indicate whether this

"adjunct database" was ever implemented; APHIS simply states that it has several

websites with permit information.  John T. Turner, Ph.D., who submitted a

Declaration (attached to APHIS's First Supplemental Brief), states that APHIS

"has vastly enhanced the types and quantity of information readily accessible to

the public on GEPPV permitting" and that "[s]erious compliance infractions are

referred to APHIS' Investigative and Enforcement Services (IES) for thorough

investigation."  Declaration of John T. Turner, Ph.D. at ¶¶14, 18.  The Plaintiffs'

Petition, however, requested a means by which information on "*all* containment

violations for GEPPVs" would be available to the public.  Plaintiffs' Concise, Ex.

18 at 2 (emphasis added).  APHIS has not created this database and has not given

any indication that it is in the process of creating this database.  As such, APHIS

denied Item 4 of the Plaintiffs' Petition.

With respect to Item 5 (moratorium), APHIS's April 17, 2003 letter

states that "[f]ield tests of GEPPVs have been conducted safely to date under

conditions of confinement[.]" AR 3023.  The letter suggests that APHIS will

consider new information as it arrives, but APHIS gives no indication that it

intends to issue an immediate moratorium as to all GEPPV field testing.  Indeed, according to the Plaintiffs, APHIS has issued thirty-eight permits since the Plaintiffs submitted their Petition (including one permit -- the Garst Seed permit discussed *supra* -- in Hawaii).  Plaintiffs' Supplemental Brief Regarding APHIS's Response to Plaintiff's December 16, 2002 Petition ("Plaintiff's First Supplemental Brief") at 4; Exhibit 1 to Plaintiffs' First Supplemental Brief.  *See also* AR 2928 (internal APHIS e-mail from March 6, 2003 stating that, "[w]ith regard to the CFS request for a moratorium on the use of GEPPVs, release of Monday's notice [the March 10, 2003 request for public comments] will be an indirect rejection of this request, as you are well aware").   Again, the court concludes that APHIS denied the Plaintiffs' request.

  b.  *APHIS's denials were neither arbitrary nor capricious*

APHIS then argues that even if its responses could be considered denials, APHIS's decisions were neither arbitrary nor capricious.[22]  The court agrees.

---

[22] APHIS argues in its First Supplemental Brief that, assuming *arguendo* Items 3 and 5 have been denied, those denials did not represent an abuse of APHIS's discretion.  APHIS does not raise the possibility that Item 4 may have been denied but that the denial was reasonable; nevertheless, the court concludes that Item 4 was denied but that the denial was reasonable.

With respect to Item 3, APHIS stated in its April 17, 2003 letter the following:  (1) "APHIS has long encouraged the [agricultural biotechnology] industry to keep [CBI] claims to a minimum, and we have consistently required that verifiable justification for such claims be provided in writing"; (2) "our ongoing review of the APHIS regulatory program for biotechnology products includes an examination of the options open to us for ensuring that more detailed information is available to our State cooperators and the interested public"; (3) "we do not agree that disclosure of CBI under [FOIA] is simply a matter of agency discretionary policy . . . [because, under FOIA,] legitimately claimed and substantiated CBI claims are exempt from disclosure"; and (4) "[i]n any potential case . . . in which a containment violation occurred which involved 'potential environmental and human health risks,' APHIS and FDA officials would ensure that all data and information relevant to the prevention of such risks was made available to investigators . . . [and] to the public."  AR 3022-23.  Thus, APHIS offered a reasoned explanation for why it was not changing its policies:  it was constrained by existing law (FOIA) and its existing policies were sufficient.  Although the Plaintiffs' Petition provides legitimate reasons for why APHIS should have different policies relating to CBI, the Plaintiffs have not explained why APHIS's decision to the contrary -- based on equally legitimate concerns --

60

was arbitrary or capricious.  *See Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d

1147, 1157 (9th Cir. 2006) ("We reverse under the arbitrary and capricious

standard only if the agency has relied on factors that Congress has not intended it

to consider, has entirely failed to consider an important aspect of the problem, or

has offered an explanation for that decision that runs counter to the evidence

before the agency or is so implausible that it could not be ascribed to a difference

in view or the product of agency expertise.").  Therefore, the court will not

overturn APHIS's decision.

        With respect to Item 4, although APHIS has not acted on the

Plaintiffs' request, the court does not have the authority to order APHIS to act on

this request.  The Plaintiffs have not pointed to any statute or regulation that

requires APHIS to establish a field test violations database, and as the Supreme

Court explained in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64

(2004), "a claim under § 706(1)[23] can proceed only where a plaintiff asserts that

an agency failed to take a *discrete* agency action that it is *required to take*."  While

the Plaintiffs may set forth many valid reasons for why APHIS *should* create and

---

        [23] 5 U.S.C. § 706(1), part of the Administrative Procedure Act, provides that a reviewing
court shall "compel agency action unlawfully withheld or unreasonably delayed[.]"  In *Southern
Utah Wilderness Alliance*, the Supreme Court interpreted this statutory language to mean that a
court cannot force an agency to take an action unless that action is required by law.  *S. Utah
Wilderness Alliance*, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the
APA is action legally *required*.").

maintain a field test violations database, the Plaintiffs have not pointed to any statute, regulation, or case that requires APHIS to do so.  Consequently, APHIS's denial as to Item 4 was neither arbitrary nor capricious, such that the Defendants are entitled to summary judgment as to this issue.

With respect to Item 5, the Plaintiffs argued in their Petition that an immediate moratorium on field testing of GEPPVs was warranted because field testing of GEPPVs could cause harm to human health and/or the environment at large.  In its April 17, 2003 letter, APHIS stated:  (1) "Field tests of GEPPVs have been conducted safely to date under conditions of confinement, and APHIS has consistently strengthened existing safeguards when indicated by inspections and monitoring"; and (2) "[a]n immediate moratorium on the use of food crops for GEPPVs and/or field testing of GEPPVs would be considered . . . should a series of unforeseen circumstances warrant such action[.]" AR 3023-24.  The Plaintiffs are correct that an agency's conclusory statement generally will not constitute "reasoned decisionmaking" sufficient to survive arbitrary and capricious review. *See Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 6 (D.C. Cir. 1987) ("The two conclusory sentences quoted above are insufficient to assure a reviewing court that the agency's refusal to act was the product of reasoned decisionmaking."). Nevertheless, in the instant case, APHIS's explanations in its April 17, 2003 letter

were enough to satisfy this standard.  In April 2003, APHIS had regulations in place governing open-air field testing of GEPPVs; in responding to the Plaintiffs' Petition, APHIS concluded that an immediate moratorium was unnecessary because existing confinement measures were adequate.  Although there is certainly evidence to support the Plaintiffs' position, there is insufficient evidence to demonstrate that APHIS acted arbitrarily or capriciously in continuing to follow its existing regulations (rather than refusing to consider any future permit applications).  Furthermore, given that APHIS was (and is) producing a programmatic EIS and was (and is) considering changes to its regulations as a result, the decision to wait for the results of the EIS -- rather than impose an immediate moratorium -- seems quite reasonable.  In short, APHIS's decision to deny Item 5 was neither arbitrary and capricious, and the Defendants are entitled to summary judgment as to this issue.

E.     Remedies for Counts One through Four and Six through Nine

              At the hearing on August 22, 2006, the court asked Plaintiffs' counsel to propose an appropriate remedy for Counts One through Four and Six through Nine.  Plaintiffs' counsel stated that declaratory relief on these counts was sufficient, inasmuch as the four permits have already expired.  Although Judge Ezra had previously raised the possibility of an environmental study of the effects

of the open-air field tests as one possible remedy, Plaintiffs' counsel candidly

stated that he did not believe this to be a prudent use of taxpayers' money (given

that the field tests were completed years ago).

The court agrees with Plaintiffs' assessment of the situation:

injunctive relief is inappropriate as to Counts One through Four and Six through

Nine.  The most the court could do is issue an injunction stating that APHIS must

comply with NEPA, the ESA, and the APA; given that APHIS is already required

to do all those things, and given that the permits have all expired (such that there

is no ongoing or pending agency action to enjoin), the court sees no reason to

issue an injunction.

## V.  CONCLUSION

Based on the foregoing, the court GRANTS IN PART and DENIES

IN PART the Plaintiffs' Motion for Summary Judgment and GRANTS IN PART

and DENIES IN PART the Defendants' Motion for Summary Judgment:  the court

GRANTS summary judgment in favor of the Plaintiffs as to Counts One, Two,

Three, Four, Six, Seven, Eight, and Nine of their Second Amended Complaint, and

the court GRANTS summary judgment in favor of the Defendants as to Counts

Five, Ten, and Eleven of the Plaintiffs' Second Amended Complaint.  As this

Order disposes of all outstanding matters in this case, the clerk of the court is

instructed to do the following:  (1) enter judgment in favor of the Plaintiffs as to Counts One, Two, Three, Four, Six, Seven, Eight, and Nine of the Plaintiffs' Second Amended Complaint; (2) enter judgment in favor of the Defendants as to Counts Five, Ten, and Eleven of the Plaintiffs' Second Amended Complaint; and (3) close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 31, 2006.



J. Michael Seabright
United States District Judge

*Center for Food Safety et al. v. Johanns et al.*, Civil No. 03-00621 JMS/LEK; Amended Order Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment