IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CENTER FOR FOOD SAFETY; KAHEA; FRIENDS OF THE EARTH, INC., and PESTICIDE ACTION NETWORK NORTH AMERICA, | ) ) ) ) | CIV. NO. 03-00621 JMS/BMK |
| Plaintiffs, | ) ) ) ) | ORDER ADOPTING IN PART AND MODIFYING IN PART THE SPECIAL MASTER'S REPORT RECOMMENDING THAT |
| vs. | ) ) ) | PLAINTIFFS' MOTION FOR ATTORNEY'S FEES BE GRANTED IN PART AND DENIED IN PART |
| MIKE JOHANNS, Secretary, U.S. Department of Agriculture; WILLIAM T. HAWKS, Under Secretary of Agriculture for Marketing and Regulatory Programs; BOBBY R. ACORD, Deputy Administrator, U.S. Department of Agriculture, Animal and Plant Health Inspection Service and CINDY SMITH, Deputy Administrator, U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Biotechnology Regulatory Services Program, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER ADOPTING IN PART AND MODIFYING IN PART THE
SPECIAL MASTER'S REPORT RECOMMENDING THAT PLAINTIFFS'
MOTION FOR ATTORNEY'S FEES BE GRANTED IN PART AND
DENIED IN PART**

# I. **INTRODUCTION**

Plaintiffs Center for Food Safety, Kahea, Friends of the Earth, Inc., and Pesticide Action Network North America (collectively "Plaintiffs") brought suit seeing declaratory and injunctive relief against Defendant officials of the United States Department of Agriculture and its Animal and Plant Health Inspection Service (collectively "Defendants" or "APHIS").  On August 31, 2006, this court granted summary judgment in favor of Plaintiffs on counts 1-4 and 6-9 and granted summary judgment in favor of APHIS on counts 5, 10, and 11.  On September 21, 2006, Plaintiffs filed a motion for attorney's fees seeking fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-34.

On April 19, 2007, Magistrate Judge Barry M. Kurren entered his findings in a Special Master's Report Recommending that Plaintiffs' Motion for Attorney's Fees Be Granted in Part and Denied in Part ("Special Master's Report").  The Special Master recommended that Plaintiffs be awarded fees in the amount of $487,281.44 and $12,646.29 in costs and other expenses.  On May 18, 2007, both Plaintiffs and Defendants filed objections to the Special Master's Report.  On May 29, 2007, the parties filed oppositions to the objections.  On June 11, 2007, Defendants filed a reply to Plaintiffs' opposition.  On June 18, 2007,

2

Plaintiffs filed a Supplemental Declaration of Paul Achitoff.  Briefly stated, Defendants ask the court to find Plaintiffs ineligible for any fees because they are not "prevailing parties," or alternatively, to reduce the recommended award by 29 percent, thereby awarding $345,969.83 to Plaintiffs.  Plaintiffs, on the other hand, claim that they are entitled to a total award at market rates of $753,969.50, or alternatively, to an award of $737,218.56 applying the EAJA rate to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, claims and market rates to the remainder.

Based on the following, the court ADOPTS in part and MODIFIES in part the Special Master's Report.  The court ADOPTS the Special Master's recommendations that Plaintiffs are entitled to fees under the EAJA and the ESA, that Plaintiffs' award should be reduced by nine percent for lack of success on counts 5 and 10 but not reduced for time spent litigating the confidentiality disputes, and that Plaintiffs are not entitled to market rates under the EAJA.  The court MODIFIES the Special Master's recommendation to award Plaintiffs' fees under the ESA at prevailing market rates in addition to fees under the EAJA at the statutory rate.

As set forth below, the court awards Plaintiffs attorney's fees of **$561,971.14** and costs and other expenses in the amount of **$12,646.29**.

## II. BACKGROUND

Plaintiffs filed this action in 2003 seeking declaratory and injunctive relief regarding permits that APHIS issued to four companies, which Plaintiffs alleged violated NEPA and § 7(a)(2) of the ESA. The permits authorized the companies to conduct field tests of genetically engineered pharmaceutical-producing plant varieties ("GEPPV") from 2001 to 2003.[1] Although the facts of the case are more fully set forth in the court's previous orders, the court briefly outlines relevant proceedings including discovery disputes regarding the disclosure of confidential business information ("CBI"), Defendants' motion to dismiss based on mootness, and summary judgment on the merits of Plaintiffs' claims.

### A.   Confidentiality Orders

During discovery, Plaintiffs sought disclosure of the location of the field test sites. Defendants opposed discovery on the grounds that the field test

---

[1] Plaintiffs' Complaint sets forth eleven claims for relief: counts 1-4 alleged violations of NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, based on APHIS's failure to prepare an Environmental Assessment ("EA") or Environmental Impact Study ("EIS") for the four permits; count 5 alleged violations of NEPA and the APA based on APHIS's failure to conduct a programmatic EIS for a nationwide GEPPV program; counts 6-9 alleged violations of § 7(a)(2) of the ESA for failure to prepare biological assessments for the four permits; count 10 alleged that APHIS's nationwide GEPPV program violated the ESA; and count 11 challenged APHIS's failure to properly promulgate rules for GEPPV permitting under the Plant Protection Act ("PPA"), 7 U.S.C. § 7701 *et seq.*

locations constituted CBI.  On April 13, 2004, Magistrate Judge Kurren ordered a

stay, pending resolution of Defendants' motion to dismiss, on all discovery except

for the location of the challenged field test sites.  On April 23, 2004, Defendants

filed a Motion for a Protective Order and on April 27, 2004, Intervenor

Biotechnology Industry Organization ("BIO") filed a Consolidated Motion for

Leave to Intervene.  On June 29, 2004, Magistrate Judge Kurren allowed BIO to

intervene for limited purposes and denied Defendants' motion for a protective

order, ruling that the field test site locations do not constitute confidential

commercial or trade secret information.  On August 3, 2004, District Court Judge

David Alan Ezra affirmed the Magistrate Judge's order allowing Plaintiffs limited

discovery on the location of the field tests and denying the Motion for a Protective

Order (although the court ordered that discovery related to the location of the tests

be kept confidential by Plaintiffs and under seal).

On August 10, 2004, BIO filed a Motion for Reconsideration to

which Defendants filed a Statement of Consent on August 23, 2004.  On

November 3, 2004, Judge Ezra denied BIO's motion and ordered the parties to

submit a written confidentially agreement to the court.  The parties then disputed

the terms of the confidentially agreement and on December 22, 2004, Magistrate

Judge Kurren entered an order setting forth the terms and conditions regarding

disclosure of the field test locations.  Five days later, on December 27, 2004,

Defendants filed a Motion to Dismiss on Grounds of Intervening Mootness.

**B.      Order Regarding Mootness**

Defendants claimed that the action was moot because the challenged

permits had expired and the disputed plantings had been harvested or removed.

Judge Ezra denied Defendants' Motion to Dismiss on Grounds of Intervening

Mootness, concluding that the "capable of repetition, yet evading review"

exception to the mootness doctrine applied.  *See Ctr. for Food Safety v. Veneman*,

364 F. Supp. 2d 1202, 1209-11 (D. Haw. 2005).  The court quoted the declaration

of Defendants' expert, Dr. Neil Hoffman, during its discussion of whether the

challenged action would affect the Plaintiffs in the future.

> As Plaintiffs note, Defendants have themselves repeatedly
> asserted that the activity will recur on these cites.  Indeed,
> Defendants' own declarant, Dr. Neil Hoffman, stated the
> following:
>
>> Historically, biotechnology companies have used
>> the same field-test sites repeatedly.  This is
>> particularly true in Hawaii where much of their
>> breeding work goes on year round.  [APHIS's
>> Biotechnology Regulatory Services] staff
>> contacted Dow and Garst, two companies that
>> recently had GEPPV trials in Hawaii.  Garst has
>> been at the same site since 1985 and has a 30 year
>> lease on the property they are using.  Dow has
>> been using the same site since the 1960s.

> Therefore, it is a certainty that the locations
> previously used for GEPPVs will be used in the
> near future for other field trials, both pursuant and
> subject to future permits.

> Moreover, the Court finds that not only is it likely that such
> testing will continue in Hawaii, but it is also likely that the
> testing will continue under the circumstances to which
> Plaintiffs object.  During the pendency of this lawsuit, at least
> 25 applications have been filed seeking permission to conduct
> biopharmaceutical field tests in other jurisdictions across the
> nation, and at least 10 have been approved by Defendants
> without an EIS or EA.  As such, the Court finds that the record
> evidences a probability that the challenged action will affect
> Plaintiffs in the future.

*Id.* at 1211 (citations omitted).  The court emphasized "the multiple assurances by

Defendants that the challenged actions will recur," *id.*, as well as the Ninth

Circuit's instruction that "courts must take special care when evaluating claims of

mootness in environmental cases."  *Id.* at 1213 (citation omitted).  Judge Ezra's

order quoted from *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir.

2001):

> When evaluating the issue of mootness in NEPA cases, we
> have repeatedly emphasized that if the completion of the action
> challenged under NEPA is sufficient to render the case
> nonjusticiable, entities could merely ignore the requirements of
> NEPA, build its structures before a case gets to court, and then
> hide behind the mootness doctrine.  Such a result is not
> acceptable.  Accordingly, defendants in NEPA cases face a
> particularly heavy burden in establishing mootness.

*Ctr. for Food Safety*, 364 F. Supp. 2d at 1213 (citation and quotation signals omitted).

## C.    Summary Judgment

On March 31, 2006, Plaintiffs and Defendants filed their motions for summary judgment.  More litigation regarding confidentiality issues followed.  On June 13, 2006, BIO filed a Motion to Maintain Seal on Confidential Information Contained in Plaintiffs' Motion for Summary Judgment.  On June 29, 2006, Magistrate Judge Kurren entered an order granting in part and denying in part BIO's motion and ordered that references to the locations of the field tests be sealed.  Plaintiffs and BIO appealed the Magistrate Judge's Order and this court affirmed the Magistrate Judge's Order on July 3, 2006.

On August 31, 2006, this court entered an Amended Order Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment ("Amended Order").  *See Ctr. For Food Safety v. Johanns*, 451 F. Supp. 2d 1165 (D. Haw. 2006).  The court granted Plaintiffs summary judgment on counts 1-4 (NEPA claims) and 6-9 (ESA claims) and granted Defendants summary judgment on counts 5, 10, and 11.  The court granted Plaintiffs' request for declaratory relief for the eight claims on which they prevailed and denied injunctive relief.

On September 21, 2006, Plaintiffs filed a motion for attorney's fees

seeking fees and costs under the EAJA, 28 U.S.C. § 2412, and the ESA, 16 U.S.C.

§§ 1531-34.

**D.     Objections to the Special Master's Report**

On April 19, 2007, Magistrate Judge Kurren entered his findings in a

Special Master's Report, recommending that Plaintiffs be awarded $487,281.44

for attorneys' fees and $12,646.29 for costs and other expenses.  The Special

Master found that Plaintiffs were eligible for fees under both the EAJA and the

ESA, but recommended that the court apply the EAJA standard to determine

Plaintiffs' entire fee award (which the Special Master calculated at $143 per hour).

In calculating the hours expended, the court reduced the fee award to reflect

Plaintiffs' level of success in the case by nine percent for failing to succeed on

counts 5 and 10, and six percent for failing to succeed on count 11, for a total

reduction of 15 percent.

*1.     Defendants' Objections*

Defendants raise the following objections to the Special Master's

Report: (1) prevailing on a declaratory judgment alone is insufficient to render

Plaintiffs "prevailing parties;" (2) the award should be further reduced because

Plaintiffs were not successful on counts 5 and 10; and (3) the award should be

reduced for time Plaintiffs spent litigating the disclosure of CBI.  Thus,

Defendants ask the court to find Plaintiffs ineligible for any fees because they are

not "prevailing parties," or alternatively, to reduce the recommended award by 29

percent, thereby awarding Plaintiffs $345,969.83.

### 2.    *Plaintiffs' Objections*

Plaintiffs argue that they are entitled to compensation at market rates

and object to the Special Master's Report on the grounds that: (1) fees for NEPA-

related work should be compensated at market rates rather than the statutory EAJA

rate; and (2) Plaintiffs are entitled to market rates for their successful ESA claims

and not the lower EAJA rate.  Plaintiffs claim that they are entitled to a total award

at market rates of $753,969.50, or alternatively, to an award of $737,218.56

applying the EAJA rate to the NEPA claims and market rates to the remainder.

## III.  <u>STANDARD OF REVIEW</u>

In acting on a special master's report, the district court must afford an

opportunity to be heard and may receive evidence.  Fed. R. Civ. P. 53(g)(1).  The

district court may "adopt or affirm; modify; wholly or partly reject or reverse, or

resubmit to the master with instructions."  *Id.*

With an irrelevant exception, the district court must decide de novo

all objections to findings of fact and/or conclusions of law made or recommended

by the special master.  Fed. R. Civ. P. 53(g)(3) and (4); *see also Summers v.*

*Howard Univ.*, 374 F.3d 1188, 1195 n. 6 (D.C. Cir. 2004) (noting that Fed. R. Civ.

P. 53 was amended in 2003 to provide for de novo review of a special master's

fact findings by the district court).

Under the EAJA and the ESA, "a district court that awards attorney

fees must provide a concise but clear explanation of its reasons for the fee award."

*Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001) (citation and quotation

signals omitted).  "Courts need not attempt to portray the discretionary analyses

that lead to their numerical conclusions as elaborate mathematical equations, but

they must provide sufficient insight into their exercises of discretion to enable us

to discharge our reviewing function."  *Id.* (*quoting Cunningham v. County of Los*

*Angeles,* 879 F.2d 481, 485 (9th Cir. 1988)).

## IV.  <u>ANALYSIS</u>

### A.    **Defendants' Objections**

Defendants raise several objections to the Special Master's Report:

(1) prevailing on a declaratory judgment alone is insufficient to render Plaintiffs

"prevailing parties;" (2) the award should be further reduced because Plaintiffs

were not successful on counts 5 and 10; and (3) the award should be reduced for

time Plaintiffs spent litigating the disclosure of CBI.  The court addresses each objection in turn.

### 1.      *Plaintiffs Are Entitled to Fees Under the EAJA*

Defendants argue that Plaintiffs are not prevailing parties because a declaratory judgment by itself cannot render an attorney fee claimant a prevailing party under the EAJA.  The court disagrees.

#### a.      *Prevailing party status*

The EAJA, which applies to Plaintiff's NEPA claims, states that "[e]xcept as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . ."  28 U.S.C. § 2412(d)(1)(A).  "A typical formulation is that plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (citation and quotation signals omitted).  "[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by

modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992).[2]

Plaintiffs can meet the prevailing party standard "by establishing that these federal court actions resulted in a 'material alteration of the legal relationship of the parties' and that the alteration was 'judicially sanctioned.'" *Li v. Keisler*, --- F.3d ----, 2007 WL 2800679, at *3 (9th Cir. Sept. 27, 2007) (*quoting Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Heath and Human Res.*, 532 U.S. 598, 604-05 (2001)[3]).

A party who achieves only declaratory relief may be a "prevailing party." In *Animal Lovers Volunteer Ass'n, Inc. v. Carlucci,* 867 F.2d 1224 (9th Cir. 1989), plaintiffs sued under the NEPA and APA seeking a declaratory judgment that an EA did not support a finding of no significant impact and an injunction prohibiting the eradication of red foxes until an EIS was prepared. After the district court denied relief, the Ninth Circuit "granted the declaratory relief sought [and] remanded for a determination whether injunctive relief should be granted." *Id.* at 1225 (citation omitted). Plaintiffs then sought fees for the trial

---

[2] *Hensley* and *Farrar* involved awards of fees under 42 U.S.C. § 1988, but "prevailing party" is defined in the same way under the EAJA. *See Nat'l Wildlife Fed'n v. FERC*, 870 F.2d 542, 544 n.1 (9th Cir. 1989).

[3] The *Buckhannon* rule regarding prevailing party status applies to EAJA fee applications. *Perez-Arellano v. Smith*, 279 F.3d 791, 794 (9th Cir. 2002).

and appeal under the EAJA.  The Ninth Circuit awarded fees under the EAJA

noting that the plaintiffs "won a determination on the merits of their claim for

declaratory relief."  *Id.*  "Our determination that the Environmental Assessment

did not support a finding of no significant impact fully satisfied appellants' prayer

for declaratory relief.  Appellants are, as a practical matter, in a markedly better

position than at the outset of their lawsuit" since defendants would be required to

prepare an EIS.  *Id.* (citation and quotation signals omitted).  *Animal Lovers*

*Volunteer Ass'n* did not require an award of injunctive relief in addition to the

declaratory judgment; the Ninth Circuit awarded attorney's fees for the declaratory

judgment litigation without consideration for the plaintiffs' pending request for an

injunction prohibiting the eradication of the foxes until an EIS was prepared.  *Id.*

     *Rhodes v. Stewart*, 488 U.S. 1 (1988), further examined "prevailing

party" status in the context of declaratory judgments.  The prisoner plaintiffs in

*Rhodes* were no longer in prison when the district court ruled in their favor and

awarded them fees.  The Supreme Court reversed the fee award concluding that

"[a] modification of prison policies on magazine subscriptions could not in any

way have benefitted either plaintiff, one of whom was dead and the other released

before the District Court entered its order."  *Id.* at 4.  In *Rhodes*, the "case was

moot before judgment issued, and the judgment therefore afforded plaintiffs no

14

relief whatsoever." *Id.* (citation and quotation signals omitted). Further, "a technical victory may be so insignificant, and may be so near the situations addressed in . . . *Rhodes*, as to be insufficient to support prevailing party status." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792 (1989).

> b.   *Plaintiffs are prevailing parties*

Plaintiffs prevailed on eight of their eleven claims, obtaining a declaratory judgment in their favor on counts 1-4 (NEPA claims) and 6-9 (ESA claims). Plaintiffs agreed that declaratory relief alone was appropriate because the four permits had already expired and therefore no meaningful injunctive relief was available.

Defendants argue that the declaratory relief afforded Plaintiffs has not changed APHIS's actions. The court disagrees. The declaratory judgment necessarily affects agency action; Defendants must now review permits differently in accord with the court's Amended Order. This is particularly true given the likelihood of future field tests conducted pursuant to future permits. As Judge Ezra's Order states, Defendants themselves repeatedly asserted that the activity will recur on these sites:

Indeed, Defendants' own declarant, Dr. Neil Hoffman, stated the following:

> Historically, biotechnology companies have used the same field-test sites repeatedly.  This is particularly true in Hawaii where much of their breeding work goes on year round. [APHIS's Biotechnology Regulatory Services] staff contacted Dow and Garst, two companies that recently had GEPPV trials in Hawaii.  Garst has been at the same site since 1985 and has a 30 year lease on the property they are using.  Dow has been using the same site since the 1960s.  Therefore, it is a certainty that the locations previously used for GEPPVs will be used in the near future for other field trials, both pursuant and subject to future permits.

> Moreover, the Court finds that not only is it likely that such testing will continue in Hawaii, but it is also likely that the testing will continue under the circumstances to which Plaintiffs object.  During the pendency of this lawsuit, at least 25 applications have been filed seeking permission to conduct biopharmaceutical field tests in other jurisdictions across the nation, and at least 10 have been approved by Defendants without an EIS or EA.  As such, the Court finds that the record evidences a probability that the challenged action will affect Plaintiffs in the future.

*Ctr. for Food Safety*, 364 F. Supp. 2d at 1211 (citations omitted).  It is not the case

that Plaintiffs' "success on a legal claim can be characterized as purely technical

or *de minimis*."  *Texas State Teachers Ass'n,* 489 U.S. at 792.  Rather, Plaintiffs

prevailed on all four of their NEPA claims regarding issuance of permits for

testing, which the court found was likely to continue under the circumstances to which Plaintiffs objected.

Further, prevailing party status here is appropriately viewed in the broader context of environmental litigation. For the same reason that the Ninth Circuit views mootness contextually in environmental cases, prevailing party status should also be viewed within this specific context. *See Cantrell,* 241 F.3d at 678 ("When evaluating the issue of mootness in NEPA cases, we have repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable. Accordingly, defendants in NEPA cases face a particularly heavy burden in establishing mootness." (citation and quotation signals omitted)); *Soda Mountain Wilderness Council v. Norton*, 2006 WL 2054062, at *1 (E.D. Cal. July 21, 2006) ("Because challenges in environmental cases are usually limited to reviewing governmental agencies' decisions, 'plaintiffs "prevail" in environmental litigation when they obtain a court judgment that identifies a substantial flaw with an agency's interpretation of law or weighing of facts.'") (*quoting Golden Gate Audubon Soc'y v. United States Army Corps of Eng'rs*, 738 F. Supp. 339, 343 (N.D. Cal. 1988)).

17

In sum, Plaintiffs obtained a declaratory judgment that materially altered the legal relationship between the parties by modifying Defendants' behavior in a way that directly benefits Plaintiffs.  Plaintiffs are prevailing parties entitled to fees under the EAJA.[4]  The court ADOPTS the Special Master's Report's finding that Plaintiffs are entitled to fees under the EAJA.

### 2. *Plaintiffs Are Entitled to Fees Under the ESA*

Plaintiffs are also eligible for fees under the ESA fee statute, 16 U.S.C. § 1540(g)(4).  Courts "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such an award is appropriate."  16 U.S.C. § 1540(g)(4).  *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 (1983), explains in the context of a similar provision in the Clean Air Act, that the statute's "whenever . . . appropriate" language "was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties -- parties achieving *some success*, even if not major success."

Plaintiffs achieved at least some success, if not major success, on their ESA claims; they were awarded declaratory judgments on four of their five

---

[4] Defendants do not appeal the Special Master's rejection of the government's "substantial justification" defense under the EAJA.

ESA claims.  The court determines that an award under the ESA is appropriate.

The court ADOPTS the Special Master's Report's finding that Plaintiffs are

entitled to fees under the ESA.

### 3.    *Reduction of Award for Lack of Success on Counts 5 and 10*

The district court has discretion to make a downward adjustment to

the fee award for the "results obtained" in the litigation, where a plaintiff is

deemed "prevailing" although it succeeded on only some of its claims for relief.

*Hensley*, 461 U.S. at 434.

> If the unsuccessful and successful claims are related, then the
> court . . . evaluates the "significance of the overall relief
> obtained by the plaintiff in relation to the hours reasonably
> expended on the litigation."  If the plaintiff obtained "excellent
> results," full compensation may be appropriate, but if only
> "partial or limited success" was obtained, full compensation
> may be excessive.  Such decisions are within the district court's
> discretion.

*Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 901-02 (9th Cir. 1995)

(*quoting Thorne v. City of El Segundo*, 802 F. 2d 1131, 1141 (9th Cir. 1986)).

The Special Master's Report recommends that the court reduce

Plaintiffs' fees for their lack of success on claims 5 and 10 by nine percent.

Defendants do not challenge the Special Master's finding that counts 5 and 10

were closely related to Plaintiffs' successful counts 1-4 and 6-9.  Defendants argue

that (1) the award should have been reduced by 14 percent and (2) the Special

Master's Report erred by placing the burden of identifying the billing specific to

counts 5 and 10 on Defendants rather than Plaintiffs.  Defendants' second

contention is without merit.  The Special Master did not place the burden on the

Defendants to establish the appropriate percentage reduction.  Rather, it appears he

carefully reviewed the record, taking into account the relatedness of counts 5 and

10 and the failure to achieve excellent results in reducing the award by nine

percent.

On August 10, 2006, the court granted Plaintiffs summary judgment

on counts 1-4 and 6-9 and ordered supplemental briefing and oral argument on

remedies and counts 5 and 10 because the parties had not sufficiently focused on

these claims.  In their supplemental brief, Plaintiffs clarified that they intended

counts 5 and 10 to be distinct and independent claims for relief and not to request

broad-based relief based on the violations articulated in counts 1-4 and 6-9.  The

court granted summary judgment as to Defendants on counts 5 and 10 on August

31, 2006.

Defendants assert that "Plaintiffs' billing records document that they

devoted approximately 14 percent of their fee hours to their nationwide NEPA

claim, nationwide ESA claim, and requested injunctive remedies."  Defs.'

Objections to Special Master's Report ("Defs.' Objections") 9-10.  The court is

unable to discern how Defendants came up with this percentage.  According to the

billing records identified by Defendants in their Objections, 202.4 hours were

spent on Plaintiffs' nationwide NEPA claim, nationwide ESA claim, and requested

injunctive remedies.[5]  The same billing records cited by Defendants list Plaintiffs'

total hours as 3,603.97 as of September 21, 2006.[6]  Using the billing entries

identified by Defendants, it appears that Plaintiffs devoted under six percent of

their fee hours to these claims.[7]  Regardless, Defendants' methodology is

fundamentally unsound because it relies on billing records that are insufficiently

specific to determine the number of hours spent on particular legal claims or

theories.

---

[5] Defendants identify the following billing entries:

> Ex. 1 at pp. 24 (researching "injunctive relief"), 27 (time spent opposing APHIS' motion for summary judgment, in which APHIS argued injunctive relief was impermissible), 28 ("research legal issues re remedies"), 29 ("research re nationwide injunctive relief"), 31 (documenting work on supplemental briefing for nationwide NEPA and ESA claims).

Defs.' Objections 10.  By the court's calculation, the sum of these entries equals 202.4 hours. *See* Ex. 1 to Pls.' Mot. for Att'ys Fees and Costs (Doc. No. 258).

[6] Exhibit 1 does not appear to include all of the hours billed for the duration of the litigation as the Special Master concluded that Plaintiffs should be awarded fees for 4,236.1 hours.  As the Special Master's Report notes, Defendants do not challenge the reasonableness of Plaintiffs' fees or documentation.

[7] 202.4 hours is approximately 5.6 percent of 3,603.97 hours.

21

Plaintiffs, on the other hand, argue that "[a]lmost all of the legal and factual research concerning those claims was applicable to plaintiffs' eight successful NEPA and ESA permit claims. Therefore, attributing approximately 360 hours of attorney time to just those two programmatic claims, as the Special Master did by deducting 9 percent, appears excessive to plaintiffs." Pls.' Opp'n to Defs.' Objections 21.[8]

The court evaluates the significance of the overall relief obtained by Plaintiffs in relation to the hours reasonably expended on the litigation. *Thorne*, 802 F.2d at 1141. Because Plaintiffs were not successful on their related claims for nationwide relief, they cannot be said to have achieved "excellent results" overall. Plaintiffs sought but failed to obtain relief with respect to nationwide permitting and environmental impacts under NEPA and the ESA. Plaintiffs obtained much of the relief sought overall, but a reduction is merited with respect to the related nationwide claims.

The court, in its discretion, concludes that the nine percent reduction recommended by the Special Master is appropriate in light of Plaintiffs' overall success in relation to the hours reasonably expended on the litigation and their

---

[8] Although Plaintiffs question the accuracy of the nine percent reduction, they have not appealed this finding.

22

lack of success on counts 5 and 10.  The court's ruling is based on a careful review

of the entire record of this case, the billing records (which are of limited assistance

given their lack of specificity), and the court's own knowledge of the litigation.

The court ADOPTS the Special Master's Report with respect to the nine percent

reduction for Plaintiffs' lack of success on counts 5 and 10.

### 4.      *No Reduction of Award for CBI Disputes*

The Special Master recommended that Plaintiffs' fees not be reduced

for the time that Plaintiffs spent defending against particular litigation phases,

including the confidentiality disputes, because it was Plaintiffs' success on these

issues that eventually enabled them to prevail on the merits of their case.

Defendants argue that the court should reduce the fee by 24 percent,

which is "the proportion of plaintiffs' billing time devoted to persistently

contesting the two confidentiality orders that plaintiffs still oppose today in the

Ninth Circuit."  Defs.' Objections 29.  According to Defendants, this is so

"because this Court eventually agreed with APHIS and BIO on two occasions that

confidentiality orders were merited," and therefore, "the Magistrate Judge

committed clear error when he found that 'plaintiffs prevailed' on the

'confidentiality' issue."  *Id.*  In making their argument, Defendants claim that the

CBI litigation should be viewed by the court as "particular claims on which

plaintiffs were not the prevailing party." Defs.' Reply to Pls.' Opp'n 15. Defendants' contention is without merit.

Defendants and intervenor BIO initiated the CBI litigation phase by seeking to stay all discovery and then seeking multiple protective orders. On April 23, 2004, Defendants filed a Motion for a Protective Order which Magistrate Judge Kurren denied on June 29, 2004, concluding that the locations of the field tests were neither confidential commercial information nor trade secrets. On August 3, 2004, Judge Ezra affirmed the Magistrate Judge's Order, allowing Plaintiffs discovery on the location of the field tests, denying the Motion for a Protective Order, and further ordering that site locations be kept confidential and under seal. On August 10, 2004, BIO filed a Motion for Reconsideration (to which Defendants filed a Statement of Consent on August 23, 2004). On November 3, 2004, Judge Ezra denied BIO's motion and ordered the parties to submit a written confidentially agreement to the court. The parties then disputed the terms of the confidentially agreement and on December 22, 2004, Magistrate Judge Kurren entered an order setting forth the terms and conditions regarding disclosure of the field test locations. The confidentiality litigation continued when BIO filed its Motion to Maintain Seal on Confidential Information Contained in Plaintiffs' Motion for Summary Judgment, which Magistrate Judge Kurren granted

in part and denied in part, ordering that references to the locations of the field tests

be sealed.  This court denied the parties' appeals and affirmed the Magistrate

Judge's Order on July 3, 2006.

"Plaintiffs are to be compensated for attorney's fees incurred for

services that contribute to the ultimate victory in the lawsuit.  Thus, even if a

specific claim fails, the time spent on that claim may be compensable, in full or in

part, if it contributes to the success of other claims." *Cabrales v. County of Los

Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991).  *Cabrales* applied *Hensley*'s rule

regarding *claims* to awarding fees for different *stages* of the litigation: "Just as

time spent on losing claims can contribute to the success of other claims, time

spent on a losing stage of litigation contributes to success because it constitutes a

step toward victory."  *Id.; see also Romberg v. Nichols*, 970 F.2d 512, 524 n.8 (9th

Cir. 1992), *vacated and remanded on other grounds*, 506 U.S. 1075 (1993)

(explaining that "an attorney should be compensated for those efforts that

reasonably may be considered to be steps along the path to ultimate victory,

whether or not every individual step was itself successful" and concluding that a

court need not compensate an attorney "for efforts expended on extraneous and

dismissed claims that did not contribute to the victory").  "[A] plaintiff who is

unsuccessful at a stage of litigation that was a necessary step to her ultimate

victory is entitled to attorney's fees even for the unsuccessful stage." *Cabrales*, 935 F.2d at 1053.

First, the court rejects Defendants' attempt to frame the confidentiality disputes as "claims." The CBI litigation constituted a phase of the litigation, not a claim pursued by Plaintiffs. And this phase of the litigation was a necessary step to Plaintiffs' ultimate success on summary judgment. In fact, given the nature of the claims involving the field test locations, it appears that the CBI litigation was inevitable.[9] Further, the characterization of Plaintiffs' results during the CBI litigation as "unsuccessful" is misleading; in fact, Plaintiffs achieved part of what they sought -- disclosure of the field test locations -- albeit under terms which they disputed. Finally, the record reflects that Defendants and intervenor BIO initiated much of the confidentiality litigation during the initial discovery disputes and during the summary judgment phase. For the foregoing reasons, the court ADOPTS the Special Master's Report with respect to Plaintiffs' award of fees for time spent litigating the confidentiality disputes.

---

[9] For example, Judge Ezra's March 2, 2005 Order Denying Intervenor's and Defendants' Motion to Stay Proceedings Pending Resolution of Defendants' Motion to Dismiss states that "the discovery that Defendants seek to stay is necessary for the purposes of litigating Plaintiffs' standing, which also goes to the jurisdiction of this Court." (Doc. No. 127).

**B.     Plaintiffs' Objections**

Plaintiffs argue that (1) they are entitled to market rates rather than the EAJA standard rate for NEPA-related work[10] and (2) fees for ESA-related work should be compensated at market rates.

### 1.     Plaintiffs Are Not Entitled to Market Rates Under the EAJA

Under the EAJA, "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A).  Three requirements must be satisfied before the court can exceed the statutory limit: "First, the attorney must possess distinctive knowledge and skills developed through a practice specialty.  Secondly, those distinctive skills must be needed in the litigation.  Lastly, those skills must not be available elsewhere at the statutory rate."  *Love v. Reilly*, 924 F.2d 1492, 1496 (9th Cir. 1991).  "Environmental litigation is an identifiable practice specialty that requires distinctive knowledge." *Id.*

---

[10] Plaintiffs do not challenge the calculation of the inflation-adjusted statutory EAJA rate of $143 recommended by the Special Master.

The Special Master declined to award EAJA fees at market rates above the inflation-adjusted statutory rate because Plaintiffs did not establish that their attorneys' distinctive skills and expertise were needed in this litigation and that comparable expertise was not available at the EAJA statutory rate.

Plaintiffs claim that the showing made in this case should have been adequate because they had been awarded market rates on NEPA claims in the past by this Special Master without proffering evidence of the need for their counsels' environmental expertise or the availability of such expertise at the EAJA statutory rate.  According to Plaintiffs, the Special Master "fault[ed] plaintiffs for not making the type of showing he himself had declared unnecessary in a case not distinguishable from this one."  Pls.' Objections to Special Master's Report ("Pls.' Objections") 15.  Plaintiffs also ask the court to exercise its discretion under Local Rule ("LR") 74.2 to consider the supplemental declarations of David Bookbinder and James Paul on the need for distinctive expertise in this case and its unavailability at less than market rates.

In support of their motion for attorney's fees, Plaintiffs submitted the declarations of Paul Achitoff and James Paul.  Achitoff states that attorneys Jenkins and Mendelson practice in Washington, D.C., that "both of these attorneys have experience in both environmental law and agricultural biotechnology issues,

and their assistance in this litigation was essential for Mr. Moriwake and me to understand and litigate the technical issues the case presented," and that he is "not aware of any attorney in Hawaii with previous experience and expertise litigating issues concerning agricultural biotechnology."  Achitoff Decl. ¶¶ 4, 5 (Doc. No. 258).  Paul declares that Achitoff's reputation is excellent, "particularly as an attorney litigating environmental issues" and that the "rates [of] attorneys in Hawai'i with experience and reputation comparable to Mr. Achitoff's are at least as high as the rate of $250 per hour being requested in this case for Mr. Achitoff's time, and often are higher."  Paul Decl. ¶¶ 3, 4 (Doc. No. 296).

The Special Master concluded that Plaintiffs failed to prove the second *Love* requirement that the attorneys' "distinctive skills" were needed in this litigation.  Achitoff's statement regarding Jenkins and Mendelson indicating that they had "experience in both environmental law and agricultural biotechnology issues, and their assistance in this litigation was essential for Mr. Moriwake and me to understand and litigate the technical issues the case presented," Achitoff Decl. ¶ 4 (Doc. No. 258), may be sufficient to demonstrate that "distinctive skill"

in environmental law was needed in this litigation.[11]  Plaintiffs, however, have

failed to make the required showing for *Love*'s third prong.

There is no evidence that the distinctive skills were not available

elsewhere at the statutory rate.  Achitoff declares only that he is "not aware of any

attorney in Hawaii with previous experience and expertise litigating issues

concerning agricultural biotechnology," Achitoff Decl. ¶ 5 (Doc. No. 258), while

Paul states that the "rates [of] attorneys in Hawai'i with experience and reputation

comparable to Mr. Achitoff's are at least as high as the rate of $250 per hour being

requested in this case for Mr. Achitoff's time, and often are higher."  Paul Decl.

¶¶ 3, 4 (Doc. No. 296).  These submissions are insufficient to show that Plaintiffs'

attorneys' distinctive skills are not available elsewhere at the statutory rate.

The court also rejects Plaintiffs' argument that the Special Master's

rulings in previous cases somehow excuse their failure to make the required

showing under *Love* in this case.  However the Special Master ruled previously,

Plaintiffs were certainly aware that they carried the burden of meeting the three

*Love* requirements.  Finally, the court, in its discretion, declines to consider for the

first time the supplemental Paul Declaration and David Bookbinder Declaration

---

[11] The court seriously questions, however, whether distinctive knowledge of agricultural biotechnology was necessary in this case.

30

submitted on May 18, 2007 as part of Plaintiffs' Objections to the Special

Master's Report.[12]  Plaintiffs have provided no explanation for the submission of

these declarations at this stage or why the information set forth in the

supplemental Paul Declaration was not included in his original Declaration.

The court ADOPTS the Special Master's Report and awards Plaintiffs

fees at the inflation-adjusted statutory rate rather than market rates under the

EAJA.

### 2.    *Plaintiffs Are Entitled to Fees at ESA Rates*

The ESA fee provision states: "The court, in issuing any final order in

any suit . . . may award costs of litigation (including reasonable attorney and

expert witness fees) to any party, whenever the court determines such award is

appropriate."  16 U.S.C. § 1540(g)(4).  Reasonable hourly rates under the attorney

fee provision of ESA "must be calculated according to the prevailing market rates

in the relevant legal community, with close attention paid to the fees charged by

lawyers of reasonably comparable skill, experience and reputation."  *Marbled*

---

[12] Under Federal Rule of Civil Procedure 53(g)(1), in acting on a special master's report, the court "must afford an opportunity to be heard and *may* receive evidence." (emphasis added). Under LR 74.2, the court "*may* exercise discretion to receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions." (emphasis added).

*Murrelet v. Pac. Lumber Co.*, 163 F.R.D. 308, 316 (N.D. Cal. 1995) (citation and quotation signals omitted).

The Special Master recommended that this court apply the EAJA standard to determine the fee award for the NEPA and ESA claims because Plaintiffs offered no distinct alternative fee award for their ESA claims.

Plaintiffs argue that the Special Master's application of the EAJA rate to their ESA claims is improper because the two fee recovery standards are distinct and should not be freely substituted for one another.  Plaintiffs also contend that the Special Master's recommended award leads to an absurd result: had Plaintiffs alleged only ESA claims or prevailed only on their ESA claims and not their NEPA claims, they would be entitled to fees at market rates and are penalized because they prevailed on their NEPA claims.  Defendants argue that Plaintiffs' billing is not specific enough to identify the bulk of their ESA hours and that the court has discretion to fashion an award under the ESA in line with the Special Master's recommendation applying only the EAJA statutory rate.

The court agrees that Plaintiffs should be awarded fees at market rates for the portion of their work attributable to their ESA claims.  In a similar case involving fees under the EAJA and 42 U.S.C. § 1988, the Ninth Circuit held that because the plaintiffs' fee award for hours spent on claims against the federal

32

government was governed by the EAJA, while the award against state defendants was governed by 42 U.S.C. § 1988, it was improper to cap the hourly rate for the entire award at the rate set under the EAJA, rather than awarding a market rate for hours spent on the claims against the state defendants. *See Sorenson v. Mink*, 239 F.3d 1140, 1149-50 (9th Cir. 2001). *Sorenson* remanded to the district court with instructions to award fees according to the market rate under § 1988 and to make factual findings regarding which hours were to be compensated at market rates under § 1988 and at the statutory EAJA rate. Based on *Sorenson*, the court next apportions the amount of hours attributable to Plaintiffs' ESA claims.[13]

Plaintiffs' billing records do not clearly delineate the amount of time spent on their NEPA, ESA, or PPA claims over the course of the litigation; most billing entries do not indicate the claims or theories to which the entries correspond.[14] The court evaluates the span of the entire case in order to determine the amount of time attributable to the NEPA and ESA claims.

---

[13] The Special Master estimated that 18 percent of Plaintiffs' total time was spent challenging the Hawaii permits under the NEPA (counts 1-4), ESA (counts 6-9), and PPA (and that one-third of this time was attributable to work under the PPA). *See* Special Master's Report 25-26. The court does not adopt this recommendation regarding hours spent on the NEPA and ESA claims based on a review of Plaintiffs' billing records and the court's own recollection of the litigation.

[14] For example, a review of Plaintiffs' billing records shows that only ten of their approximately 900 billing entries specify work done on ESA issues. *See* Pls.' Ex. 1 at 6, 8, 13, 23, 24 (Doc. No. 258). Twelve entries indicate NEPA-specific work. *See id.* at 2, 6, 7, 8, 23, 24.

The work done in the early stages of the case was equally applicable to Plaintiffs' NEPA and ESA claims; their preliminary research and work leading to the filing of the Complaint and time spent defending against the various motions to dismiss for standing and mootness and the discovery disputes does not appear to be NEPA or ESA-specific.  When the case reached the merits portion of the litigation, based on a review of the briefing, it appears Plaintiffs devoted substantially more time to NEPA-related issues.  During the summary judgment phase, the parties spent more time addressing the substance of Plaintiffs' NEPA claims.  The NEPA claims were partially fact-based and required review of the administrative record, while the ESA claims involved largely legal issues.  Based on a review of the entire record, including the Plaintiffs' billing records, the greater portion of the briefing and oral argument devoted to NEPA issues, and the court's own knowledge of the case, the court determines that 75 percent of the billing should be attributed to the NEPA claims and 25 percent to the ESA claims. The court MODIFIES the Special Master's Report and concludes that Plaintiffs' should be awarded reasonable fees under the ESA.

## C.    Summary of Award

Plaintiffs' fee award is calculated in three steps: first the proper rate is determined, next the rate is multiplied by the number of hours reasonably

expended in the litigation, and finally, the award is adjusted to account for Plaintiffs' degree of success.  Defendants do not contest the reasonableness of Plaintiffs' fees or the documentation of these fees and do not object to the Special Master's finding that Plaintiffs' billing records are reasonable.

### 1. *Hourly Rates*

As discussed above, Plaintiffs are entitled to fees under the EAJA statutory rate of **$143** per hour for their NEPA claims.  Plaintiffs are also entitled to fees under the ESA at prevailing market rates in the relevant legal community. *See Marbled Murrelet*, 163 F.R.D. at 316.

Plaintiffs request the following rates: $250 per hour for Mr. Achitoff, $220 per hour for Mr. Henkin, $160 per hour for Mr. Moriwake and Ms. Sproat, $405 per hour for Mr. Jenkins, $360 per hour for Mr. Mendelson, and $85 per hour for work done by law clerks.  Plaintiffs submitted the Achitoff and Paul declarations in support of their rates, as well as the "Laffey Matrix" in support of the rates for Jenkins and Mendelson, which is used by courts in the District of Columbia to determine rates for attorneys in that district seeking fee awards.  The declarations submitted by Plaintiffs indicate that the prevailing hourly rates in Honolulu, Hawaii and Washington, D.C. for lawyers with similar experience are in accord with Plaintiffs' requested rates.  Defendants do not contest the

reasonableness of Plaintiffs' hourly rates.  The court finds the hourly rates billed

by Plaintiffs' lawyers are reasonable given the amount of experience of the

lawyers, the average rate of lawyers in the relevant communities, and the

complexity of the case.

### 2. *Hours Reasonably Expended*

The court finds that the amount of time spent is reasonable given the

complexity of the case and ADOPTS the Special Master's formulation of hours

expended as follows (with additional hours for litigating attorney's fees before this

court): (1) Paul Achitoff: 2,114.2 hours on the principal litigation, 158.1 hours

litigating attorney's fees before the Special Master, and 56 additional hours

litigating attorney's fees before this court, *see* Supplemental Achitoff Decl. ¶ 2

(Doc. No. 314); (2) David Henkin: 1 hour; (3) Isaac Moriwake: 1,286.7 hours on

principal litigation and 65.9 hours on attorney's fees; (4) Kapua Sproat: 18.5 hours

on principal litigation and 4 hours on attorney's fees; (5) Peter Jenkins: 462.3

hours on the principal litigation; (6) Joseph Mendelson: 125.4 on the principal

litigation; and (7) Law clerks: 183.57 hours.

Attributing 25 percent of Plaintiffs' time billed to the ESA market rates[15] and 75 percent of the time billed to the statutory EAJA rate[16] yields a fee award of **$734,602.81**.  The Special Master recommended and the parties do not object to a reduction of ten percent to account for any additional inefficiencies,[17] which yields a base fee award of **$661,142.52**.

//

//

---

[15] The court calculates the ESA award as 25 percent of the total hours multiplied by the various hourly rates:

| | | |
|---|---|---|
| Achitoff: | 25% x 2,328.3 hours x $250/hour = | $145,518.75 |
| Henkin: | 25% x 1 hour x $220/hour = | $55 |
| Moriwake: | 25% x 1,352.6 hours x $160/hour = | $54,104 |
| Sproat: | 25% x 22.5 hours x $160/hour = | $900 |
| Jenkins: | 25% x 462.3 hours x $405/hour = | $46,807.88 |
| Mendelson: | 25% x 125.4 hours x $360/hour = | $11,286 |
| Law clerks: | 25% x 183.57 hours x $85/hour = | $3,900.86 |

Total:  $262,572.49

[16] The court calculates the EAJA award as 75 percent of the total hours multiplied by the EAJA rate of $143 per hour for attorneys and the agreed upon $85 per hour rate for law clerks:

| | |
|---|---|
| Achitoff: | 75% x 2,328.3 hours x $143/hour = $249,710.17 |
| Henkin: | 75% x 1 hour x $143/hour = $107.25 |
| Moriwake: | 75% x 1,352.6 hours x $143/hour = $145,066.35 |
| Sproat: | 75% x 22.5 hours x $143/hour = $2,413.13 |
| Jenkins: | 75% x 462.3 hours x $143/hour = $49,581.68 |
| Mendelson: | 75% x 125.4 hours x $143/hour = $13,449.15 |
| Law clerks: | 75% x 183.57 hours x $85/hour = $11,702.59 |

Total:  $472,090.32

[17] In their request for fees, Plaintiffs had already reduced the hours expended by 8.5 percent to account for inefficiency.

### 3. Adjustment to Account for Plaintiffs' Degree of Success

The court next reduces the base fee award by a total of 15 percent to account for Plaintiffs' lack of success on counts 5 and 10 (nine percent reduction) and count 11 (six percent reduction). This yields a final attorney's fee award of **$561,971.14**.[18]

### 4. Costs

The Special Master recommended and the parties do not object to awarding Plaintiffs' **$12,646.29** in costs and other expenses.

## V. CONCLUSION

For the foregoing reasons, the court ADOPTS in part and MODIFIES in part the Special Master's Report as follows:

The court ADOPTS the Special Master's Report's recommendations that Plaintiffs are entitled to fees under the EAJA and the ESA, that Plaintiffs' award should be reduced by nine percent for lack of success on counts 5 and 10 but not reduced for time spent litigating the CBI disputes, and that Plaintiffs are not entitled to market rates under the EAJA.

---

[18] $661,142.52 x 85% = $561,971.14.

The court MODIFIES the Special Master's Report to award Plaintiffs' fees under the ESA at prevailing market rates in addition to fees under the EAJA at the statutory rate.

As set forth above, the court awards Plaintiffs attorney's fees of **$561,971.14** and costs and other expenses in the amount of **$12,646.29**.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 18, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Center for Food Safety et al. v. Johanns et al.*, Civil No. 03-00621 JMS/BMK; ORDER ADOPTING IN PART AND MODIFYING IN PART THE SPECIAL MASTER'S REPORT RECOMMENDING THAT PLAINTIFFS' MOTION FOR ATTORNEY'S FEES BE GRANTED IN PART AND DENIED IN PART